**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TERRY ASTON, JOHN FRATTI, LINDA MARTIN, DAVID MELVIN, ESTER SCHULKIN, and JENNIFER WILCOX, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:16-cv-00086-RJL |
| JOHNSON & JOHNSON, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., RENAISSANCE TECHNOLOGIES, L.L.C., PETER F. BROWN, ROBERT L. MERCER, JAMES H. SIMONS, and DR. MARGARET A. HAMBURG, | ) ) ) ) ) ) ) ) ) ) | Judge Richard J. Leon |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
JOHNSON & JOHNSON, JANSSEN RESEARCH & DEVELOPMENT LLC, AND
JANSSEN PHARMACEUTICALS, INC.'S MOTION TO DISMISS**

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ..................................................................................................1

BACKGROUND ....................................................................................................2

    A.     Overview of Levaquin ..................................................................................2

    B.     Warnings Provided in Levaquin's Labeling ............................................3

    C.     Product Liability Litigation Involving Levaquin .....................................5

    D.     Plaintiffs and Their Alleged Injuries.........................................................7

    E.     Plaintiffs' Conspiracy Theory.....................................................................8

    F.     Plaintiffs' Causes of Action ......................................................................10

STANDARD OF REVIEW ...................................................................................10

ARGUMENT ........................................................................................................11

I.      PLAINTIFFS' CLAIMS ARE BARRED TO THE EXTENT THEY ARE
       PREMISED ON ALLEGEDLY IMPROPER INTERACTIONS WITH THE FDA ....11

II.     PLAINTIFFS' CLAIMS ARE BARRED TO THE EXTENT THEY ARE
       PREMISED ON "OFF-LABEL PROMOTION" OR OTHER ALLEGED
       VIOLATIONS OF THE FDCA .........................................................................15

III.    PLAINTIFFS LACK STANDING TO SUE UNDER THE LANHAM ACT .................18

IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER RICO............................................18

    A.     Failure To Plead a Pattern of Racketeering Activity .............................19

    B.     Lack of "But-For" And Proximate Causation........................................20

V.     PLAINTIFFS' PRODUCT LIABILITY CLAIMS FAIL ON THE MERITS .................22

    A.     Displacement by the New Jersey Products Liability Act.......................22

    B.     Failure To Plead Causation With Plausibility.........................................24

    C.     Manufacturing Defect Theory..................................................................25

i

D.     Design Defect Theory ..........................................................................26

E.     Failure-To-Warn Theory.......................................................................28

F.     Other Product Liability Theories ..........................................................30

G.     Fraud/Misrepresentation Theories ........................................................30

H.     Breach of Express Warranty .................................................................33

I.     Breach of Implied Warranty .................................................................34

J.     Unjust Enrichment ................................................................................35

VI.     PLAINTIFF FRATTI'S CLAIMS ARE TIME-BARRED...............................36

CONCLUSION......................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. v. Elsevier, Inc.*,
    732 F.3d 77 (1st Cir. 2013) ....................................................................................24

*In re Actimmune Mktg. Litig.*,
    614 F. Supp. 2d 1037 (N.D. Cal. 2009 ...........................................................21, 22

*Adams v. G.D. Searle & Co.*,
    576 So. 2d 728 (Fla. App. 1991) ............................................................................30

*Allain v. Wyeth Pharms., Inc.*,
    2015 U.S. Dist. LEXIS 4073 (N.D. Ala. Jan. 14, 2015) .........................................29

*Amarin Pharma, Inc. v. FDA*,
    119 F. Supp. 3d 196, 2015 U.S. Dist. LEXIS 103944 (S.D.N.Y. Aug. 7, 2015) ....16

*Amos v. Biogen Idec Inc.*,
    28 F. Supp. 3d 164, 169 (W.D.N.Y. 2014) .............................................................27

*Anderson v. USAA Cas. Ins. Co.*,
    221 F.R.D. 250 (D.D.C. 2004) ..........................................................................31, 32

*Anza v. Ideal Supply Corp.*,
    547 U.S. 451 (2006) ................................................................................................21

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ *passim*

*In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*,
    588 F. App'x 171 (3d Cir. 2014) ..............................................................................2

*Batchelor v. Pfizer, Inc.*,
    2013 U.S. Dist. LEXIS 103974 (M.D. Ala. July 25, 2013) ....................................28

*\*Beck v. Prupis*,
    529 U.S. 494 (2000) ................................................................................................20

*Booker v. Johnson & Johnson*,
    54 F. Supp. 3d 868, 875 (N.D. Ohio 2014) ............................................................26

*Brink v. Cont'l Ins. Co.*,
    787 F.3d 1120 (D.C. Cir. 2015) ........................................................................19, 20

*Buckman Co. v. Plaintiffs' Legal Comm.,
   531 U.S. 341 (2001)..................................................................12, 13, 14, 15, 17

Caplinger v. Medtronic, Inc.,
   784 F.3d 1335 (10th Cir. 2015) ........................................................16

*Caplinger v. Medtronic, Inc.,
   921 F. Supp. 2d 1206 (W.D. Okla. 2013) ............................................17

Cleary v. Philip Morris, Inc.,
   656 F.3d 511 (7th Cir. 2011) ...........................................................36

Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz,
   82 F. Supp. 3d 344, 358 (D.D.C. 2015) .............................................35

Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.,
   941 F.2d 1220 (D.C. Cir. 1991)........................................................14

Dawson v. Medtronic, Inc.,
   2013 U.S. Dist. LEXIS 112877 (D.S.C. Aug. 9, 2013) ..........................16

Dist. 1199P Health & Welfare Plan v. Janssen,
   2008 U.S. Dist. LEXIS 103526 (D.N.J. Dec. 23, 2008).........................22

Dist. 1199P Health & Welfare Plan v. Janssen L.P.,
   784 F. Supp. 2d 508 (D.N.J. 2011) ...................................................21

Dyson v. Pharmacia & Upjohn Co.,
   21 F. App'x 2 (D.C. Cir. 2001).........................................................29

Dyson v. Winfield,
   113 F. Supp. 2d 35 (D.D.C. 2000) ....................................................34

Emp'r Teamsters-Local Nos. 17/505 Health Welfare Trust Fund v. Bristol Myers
   Squibb Co.,
   2013 U.S. Dist. LEXIS 21589 (S.D. W. Va. Jan. 29, 2013)....................22

In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.,
   590 F. Supp. 2d 1282 (C.D. Cal. 2008) ..........................................14, 22

In re Fluoroquinolone Prods. Liab. Litig.,
   2015 U.S. Dist. LEXIS 107667 (J.P.M.L. Aug. 17, 2015) .........................6

Foster v. Am. Home Prods. Corp.,
   29 F.3d 165 (4th Cir. 1994) .............................................................24

*Garcia v. Wyeth-Ayerst Labs.,
   385 F.3d 961 (6th Cir. 2004) ........................................................13, 14

iv

*Goldfine v. Sichenzia*,
  118 F. Supp. 2d 392 (S.D.N.Y. 2000)............................................................18

*\*Guarino v. Wyeth*,
  719 F.3d 1245 (11th Cir. 2013) ....................................................................24

*\*Guidry v. Janssen Pharms., Inc.*,
  2016 U.S. Dist. LEXIS 18966 (E.D. La. Feb. 17, 2016) ..................................26, 33

*Hain v. Johnson & Johnson*,
  No. ATL-L-8568-11 (N.J. Super. Ct. Atlantic Cnty. June 13, 2013) ......................6

*Harris v. Koenig*,
  602 F. Supp. 2d 39 (D.D.C. 2009) .................................................................38

*Hawkins v. Medtronic, Inc.*,
  2014 U.S. Dist. LEXIS 11779 (E.D. Cal. Jan. 30, 2014)..................................17, 18

*\*Hemi Grp. v. City of New York*,
  559 U.S. 1 (2010)......................................................................................21

*Holmes v. SIPC*,
  503 U.S. 258 (1992)...............................................................................20, 21

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
  610 F.3d 382 (7th Cir. 2010) .......................................................................38

*Jefferson v. Collins*,
  905 F. Supp. 2d 269 (D.D.C. 2012).................................................................32

*Jenkins v. WMATA (In re Fort Totten Metrorail Cases)*,
  793 F. Supp. 2d 133 (D.D.C. 2011) ...............................................................34

*Jennings v. Emry*,
  910 F.2d 1434 (7th Cir. 1990) ..................................................................19, 20

*JOC, Inc. v. Exxonmobil Oil Corp.*,
  2010 U.S. Dist. LEXIS 32305 (D.N.J. Apr. 1, 2010) ...........................................34

*Johnson v. Johnson & Johnson*,
  No. ATL-L-1577-10 (N.J. Super. Ct. Atlantic Cnty. July 2, 2014)...........................6

*Johnson v. Teva Pharms. USA, Inc.*,
  758 F.3d 605 (5th Cir. 2014) ........................................................................24

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ..................................................................11, 31

*Kury v. Abbott Labs, Inc.*,
   2012 U.S. Dist. LEXIS 4862 (D.N.J. Jan. 17, 2012) ............................................................34

*Layzer v. Leavitt*,
   770 F. Supp. 2d 579 (S.D.N.Y. 2011)....................................................................................16

*\*In re Lead Paint Litig.*,
   924 A.2d 484 (N.J. 2007)...............................................................................................22, 23

*In re Levaquin Prods. Liab. Litig.*,
   560 F. Supp. 2d 1384 (J.P.M.L. 2008)...................................................................................5

*Levi v. Brown & Williamson Tobacco Corp.*,
   851 F. Supp. 2d 8 (D.D.C. 2012) .........................................................................................11

*Lewis v. Parker*,
   67 F. Supp. 3d 189 (D.D.C. 2014) .......................................................................................37

*\*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014).........................................................................................................18

*Liberty Mut. Ins. Co. v. Equip. Corp. of Am.*,
   646 F. Supp. 2d 51 (D.D.C. 2009).......................................................................................34

*Limestone Dev. Corp. v. Vill. of Lemont*,
   520 F.3d 797 (7th Cir. 2008) ...............................................................................................11

*McElroy v. Amylin Pharms., Inc.*,
   573 F. App'x 545 (6th Cir. 2014) .........................................................................................25

*Mendelovitz v. Vosicky*,
   40 F.3d 182 (7th Cir. 1994) ..................................................................................................21

*Midwest Grinding Co. v. Spitz*,
   976 F.2d 1016 (7th Cir. 1992) ..............................................................................................19

*Montich v. Miele USA, Inc.*,
   849 F. Supp. 2d 439 (D.N.J. 2012) ......................................................................................35

*Morrison v. Syntex Labs., Inc.*,
   101 F.R.D. 743 (D.D.C. 1984)..............................................................................................18

*\*Mutual Pharmaceutical Co. v. Bartlett*,
   133 S. Ct. 2466 (2013)..........................................................................................................26

*New Hope Pipe Liners, LLC v. Composites One, LCC*,
   2009 U.S. Dist. LEXIS 11217 (D.N.J. Nov. 30, 2009)........................................................23

*News World Commc'ns, Inc. v. Thompsen,*
  878 A.2d 1218 (D.C. 2005) ..............................................................................35

*Parr v. Ebrahimian,*
  774 F. Supp. 2d 234 (D.D.C. 2011) ..................................................................31

*Patteson v. Astrazeneca, LP,*
  876 F. Supp. 2d 27 (D.D.C. 2012) ....................................................................29

*Pernice v. Bovim,*
  2015 U.S. Dist. LEXIS 112919 (D.D.C. Aug. 26, 2015) ....................................35

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011)............................................................................................5

*Rollins v. Wackenhut Servs.,*
  802 F. Supp. 2d 111 (D.D.C. 2011) ..................................................16, 25, 27, 30

*Rotella v. Wood,*
  528 U.S. 549 (2000)..........................................................................................37

*Se. Laborers Health & Welfare Fund v. Bayer Corp.,*
  655 F. Supp. 2d 1270 (S.D. Fla. 2009). ............................................................22

*SEIU Health & Welfare Fund v. Philip Morris Inc.,*
  249 F.3d 1068 (D.C. Cir. 2001) ........................................................................21

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP,*
  20 F. Supp. 3d 305, 322-23 (E.D.N.Y. 2014) ................................................21, 22

*Shaw v. Marriott Int'l, Inc.,*
  605 F.3d 1039 (D.C. Cir. 2010) ........................................................................22

*Simoneau v. Stryker Corp.,*
  2014 U.S. Dist. LEXIS 43137 (D. Conn. Mar. 31, 2014)....................................33

*Sinclair v. Merck & Co.,*
  948 A.2d 587 (N.J. 2008)..................................................................................23

*Smith v. Bristol-Myers Squibb Co.,*
  2009 U.S. Dist. LEXIS 121062 (D.N.J. Dec. 30, 2009) ......................................29

*Snyder v. Farnam Cos.,*
  792 F. Supp. 2d 712 (D.N.J. 2011) ............................................................33, 35, 36

*Sprint Fidelis Leads Prods. Liab. Litig.,*
  592 F. Supp. 2d 1147, 1161 (D. Minn. 2009) ....................................................15

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*,
   171 F.3d 912 (3d Cir. 1999)...........................................................................36

*Summit Props., Inc. v. Hoechst Celanese Corp.*,
   214 F.3d 556 (5th Cir. 2000) ......................................................................18

*Sundberg v. TTR Realty, LLC*,
   109 A.3d 1123 (D.C. 2015) ........................................................................32

*\*Tsavaris v. Pfizer, Inc.*,
   2016 U.S. Dist. LEXIS 11465 (S.D. Fla. Feb. 1, 2016)....................................28, 32

*In re U.S. Office Prods. Co. Sec. Litig.*,
   251 F. Supp. 2d 77 (D.D.C. 2003) .............................................................31

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010)......................................................................22

*UFCW Unions & Emprs. Midw. Health Benefits Fund v. Walgreen Co.*,
   2012 U.S. Dist. LEXIS 104315 (N.D. Ill. July 26, 2012)....................................14

*United States v. Caronia*,
   703 F.3d 149 (2d Cir. 2012)......................................................................16

*United States v. King-Vassel*,
   728 F.3d 707 (7th Cir. 2013) .....................................................................16

*VRG Corp. v. GKN Realty Corp.*,
   641 A.2d 519 (N.J. 1994)..........................................................................35

*Webster v. Pacesetter, Inc.*,
   259 F. Supp. 2d 27 (D.D.C. 2003) .............................................................15

*Williams v. Zimmer US, Inc.*,
   2015 U.S. Dist. LEXIS 91238 (E.D.N.C. July 14, 2015) ......................................13

*Witherspoon v. Philip Morris, Inc.*,
   964 F. Supp. 455 (D.D.C. 1997)................................................................33

*Wright v. Medtronic, Inc.*,
   81 F. Supp. 3d 600, 612 (W.D. Mich. 2015) .........................................................17

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
   2010 U.S. Dist. LEXIS 80758 (S.D. Ill. Aug. 5, 2010) ....................................21, 22

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*,
   808 F.3d 281 (6th Cir. 2015) .....................................................................27

*Young v. Johnson & Johnson,*
    No. ATL-L-268-11 (N.J. Super. Ct. Atlantic Cnty. July 21, 2014) ..........................................6

*Zafarana v. Pfizer Inc.,*
    724 F. Supp. 2d 545 (E.D. Pa. 2010) ......................................................................................36

**Statutes and Rules**

15 U.S.C. § 1125(a)(1)(B) ..............................................................................................10, 18

18 U.S.C. § 208 ........................................................................................................................9

18 U.S.C. § 1001 ......................................................................................................................9

18 U.S.C. § 1961(1)(B) ..........................................................................................................19

18 U.S.C. § 1962 ............................................................................................................10, 19

18 U.S.C. § 1964(c) ................................................................................................................20

21 U.S.C. § 301 ......................................................................................................................12

21 U.S.C. § 331(a)(1) .............................................................................................................15

21 U.S.C. § 337(a) ..........................................................................................................12, 15

21 U.S.C. § 393 ..............................................................................................................15, 19

D.C. Code § 12-301(8) ...........................................................................................................37

D.C. Code § 28:2-313 (2016) ................................................................................................33

D.C. Code § 28:2-607(3) ................................................................................................34, 35

D.C. Code § 28:2-725 .............................................................................................................37

N.J. Stat. Ann. § 2A:14-2(a) ..................................................................................................37

N.J. Stat. Ann. § 2A:58C-1 .............................................................................................22, 23

N.J. Stat. Ann. § 2A:58C-2 ....................................................................................................23

N.J. Stat. Ann. § 12A:2-313 ..................................................................................................33

N.J. Stat. Ann. § 12A:2-607(3)(a) ..................................................................................34, 35

N.J. Stat. Ann. § 12A:2-725 ..................................................................................................37

**Other Authorities**

Fed. R. Civ. P.  8(a) ................................................................................................................27, 31

Fed. R. Civ. P. 9(b) ........................................................................................................11, 20, 31, 38

*Buckman v. Plaintiffs' Legal Committee*,
    2000 U.S. S. Ct. Briefs LEXIS 504 (Sept. 13, 2000)...............................................................13

James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed*
    *Consent: Debunking Myths and Misconceptions*,
    53 Food & Drug L.J. 71, 84 (1998) .......................................................................................17

*Levaquin Lawsuits*, Bloomberg Business (Nov. 1, 2012), http://www.
    bloomberg.com/news/articles/2012-11-01/johnson-johnson-reaches-
    settlement-in-845-levaquin-cases ............................................................................................6

Margaret Cronin Fisk and Beth Hawkins, *Johnson & Johnson Settles 845*
    *Levaquin Lawsuits*, Bloomberg Business (Nov. 1, 2012), http://www.
    bloomberg.com/news/articles/2012-11-01/johnson-johnson-reaches-
    settlement-in-845-levaquin-cases ............................................................................................6

Melly Alazraki, *The 10 Biggest-Selling Drugs That Are About to Lose Their*
    *Patent;* Daily Finance (Feb. 27, 2011) ...............................................................................24

New Jersey Courts, *Levaquin*, http://www.judiciary.state.nj.us/mass-tort/levaquin/.....................6

Defendants Johnson & Johnson, Janssen Research & Development LLC (f/k/a Johnson & Johnson Pharmaceutical Research & Development, LLC), and Janssen Pharmaceuticals, Inc. (f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc.) (collectively, "J&J") submit this memorandum in support of their motion to dismiss the Complaint of Plaintiffs Terry Aston, John Fratti, Linda Martin, David Melvin, Ester Schulkin, and Jennifer Wilcox (collectively, "Plaintiffs").

## INTRODUCTION

This is a product liability suit wrapped in a conspiracy theory. Plaintiffs are six individuals who allege that they suffered adverse reactions to Levaquin, an antibiotic manufactured by one of J&J's many operating companies. Plaintiffs embed their (conclusorily pled) product liability claims against J&J within a RICO complaint alleging a "racketeering" conspiracy among J&J (and two of its subsidiaries), the former Commissioner of the U.S. Food and Drug Administration ("FDA"), her husband, his investment company, and his co-workers. The object of the alleged conspiracy was to boost Levaquin sales, which in turn would raise J&J's stock prices. Unsurprisingly, the complaint alleges absolutely no detail about this far-fetched conspiracy or how it resulted in injury to Plaintiffs. For good measure, Plaintiffs throw in a claim under the federal Lanham Act as well.

The numerous shortcomings of Plaintiffs' RICO claims are set forth in detail in the brief of Renaissance Technologies, L.L.C., and those arguments apply equally to J&J, as set forth below. But dismissal is also compelled for many other reasons. Plaintiffs' claims are preempted or precluded by the Federal Food, Drug, and Cosmetic Act ("FDCA") because the FDA alone is empowered to police wrongdoing of the variety that Plaintiffs allege here. Plaintiffs lack standing to sue under the Lanham Act because they are consumers, not competitors. Plaintiffs' state-law product liability claims are deficiently pled in various respects. And the claims of Plaintiff

John Fratti are time-barred on their face, as he commenced (and later dismissed) a similar Levaquin suit against J&J well over six years ago.

The Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"—or wild conspiracy theories, for that matter. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The complaint should be dismissed.

## BACKGROUND

### A.    Overview of Levaquin

The quinolones are a family of prescription antibacterial medicines. Fluoroquinolones, a subclass of quinolones, play an important role in the treatment of serious infections, especially those resistant to older antibacterial drugs. They remain among the few medications approved to combat terrorism, with approvals for the treatment of anthrax and the plague.

Levaquin® (levofloxacin) is a "third-generation" fluoroquinolone. It was patented by Daiichi Pharmaceutical Company, developed in the United States by a Johnson & Johnson subsidiary, and approved by the FDA in 1996. It has nine FDA-approved indications: pneumonia (nosocomial and community acquired); acute bacterial sinusitis; acute bacterial exacerbation of chronic bronchitis; skin and skin structure infections (complicated and uncomplicated); chronic bacterial prostatitis; urinary tract infections (complicated and uncomplicated); acute pyelonephritis; inhalational anthrax, post-exposure; and plague.[1]

Generic levofloxacin first entered the market in June 2011.[2]  At least 20 companies have

---

[1] *See* Levaquin Label (2014) (Exhibit 1 to Declaration of Jonah M. Knobler ("Knobler Decl.")). The Court may take judicial notice of drug labels and other documents that are "publicly available on the FDA's website." *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 588 F. App'x 171, 174 n.14 (3d Cir. 2014).

[2] *See FDA Approves First Generic Versions of the Antibiotic Levofloxacin To Treat Certain Infections* (June 20, 2011) (Knobler Decl., Ex. 2).

received FDA approval to sell generic levofloxacin.[3]  Since Levaquin "went generic" in 2011, almost all prescriptions for "Levaquin" have been filled with cheaper generic levofloxacin not manufactured by J&J.  As a result, in 2011, even though generic levofloxacin was only on the market for six months, sales of name-brand Levaquin "declined 54.1% … as compared to 2010."[4]  The next year, Levaquin sales "declined [another] 94% … as compared to 2011."[5]

## B.    Warnings Provided in Levaquin's Labeling

For many years, Levaquin's labeling has expressly warned of certain potential side ef-fects.  Since at least **1998**, Levaquin's FDA-approved labeling warned of the potential for:

- [c]onvulsions and toxic psychoses;

- increased intracranial pressure and central nervous system stimulation which may lead to tremors, restlessness, anxiety, lightheadedness, confusion, hallucinations, paranoia, depression, nightmares, insomnia, and rarely, suicidal thoughts or acts;

- [s]erious and occasionally fatal hypersensitivity and/or anaphylactic reactions;

- cardiovascular collapse, hypotension/shock, seizure, loss of consciousness, tin-gling, angioedema (including tongue, laryngeal, throat, or facial edema/swelling), airway obstruction (including bronchospasm, shortness of breath, and acute res-piratory distress), dyspnea, urticaria, itching, and other serious skin reactions;

- fever, rash or severe dermatologic reactions (e.g., toxic epidermal necrolysis, Ste-vens-Johnson Syndrome); vasculitis; arthralgia; myalgia; serum sickness; allergic pneumonitis; interstitial nephritis; acute renal insufficiency or failure; hepatitis; jaundice; acute hepatic necrosis or failure; anemia, including hemolytic and aplas-tic; thrombocytopenia, including thrombotic thrombocytopenic purpura; leukope-nia; agranulocytosis; pancytopenia; and/or other hematologic abnormalities;

- [p]seudomembranous colitis … rang[ing] in severity from mild to life-threatening;

- [r]uptures of the shoulder, hand, or Achilles tendons that require[] surgical repair or result[] in prolonged disability;

---

[3]*See* FDA-Approved Drug Products Containing Levofloxacin (Knobler Decl., Ex. 3).

[4] Johnson & Johnson, SEC Form 10-K (2012) (Knobler Decl., Ex. 4) (emphasis added).

[5] Johnson & Johnson, SEC Form 10-K (2013) (Knobler Decl., Ex. 5) (emphasis added).

- [m]oderate to severe phototoxicity reactions;

- disturbances of blood glucose, including symptomatic hyper- and hypoglycemia;

- neurologic adverse effects (e.g., dizziness, lightheadedness).[6]

Since at least **2000**, Levaquin's labeling additionally warned of the potential for:

- prolongation of the QT interval on the electrocardiogram and infrequent cases of arrhythmia … [or] torsades de pointes;

- ophthalmologic abnormalities, including cataracts and multiple punctate lenticular opacities.[7]

Since **2004**, Levaquin's FDA-approved labeling additionally warned:

- Peripheral Neuropathy: Rare cases of sensory or sensorimotor axonal polyneuropathy affecting small and/or large axons resulting in paresthesias, hypoesthesias, dysesthesias and weakness have been reported …. Levofloxacin should be discontinued if the patient experiences symptoms of neuropathy including pain, burning, tingling, numbness, and/or weakness or other alterations of sensation including light touch, pain, temperature, position sense, and vibratory sensation in order to prevent the development of an irreversible condition.[8]

Since **2007**, Levaquin's FDA-approved labeling additionally warned of:

- *Clostridium difficile*-associated diarrhea (CDAD) … rang[ing] in severity from mild diarrhea to fatal colitis;

- [a]n increased incidence of musculoskeletal disorders (arthralgia, arthritis, tendonopathy, and gait abnormality) … in pediatric patients;

- exaggerated sunburn reactions (e.g., burning, erythema, exudation, vesicles, blistering, edema) involving areas exposed to light;

- development of drug-resistant bacteria.[9]

Since **2008**, Levaquin's labeling has carried a "black box" warning stating: "WARNING:

Fluoroquinolones, including LEVAQUIN®, are associated with an increased risk of tendinitis

---

[6] *See* Levaquin Label (1998) at 13-17 (Knobler Decl., Ex. 6).

[7] *See* Levaquin Label (2000) at 16, 22 (Knobler Decl., Ex. 7).

[8] *See* Levaquin Label (2004) at 18 (Knobler Decl., Ex. 8).

[9] *See* Levaquin Label (2007) at 13-14 (Knobler Decl., Ex. 9).

and tendon rupture in all ages."  A "black box" warning is the "strongest" warning that a label can provide.  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 2573 (2011). The label went on to explain that this adverse reaction may involve "the Achilles tendon … the rotator cuff (the shoulder), the hand, the biceps, the thumb, and other tendon sites."  Additionally, Levaquin's labeling began warning of the potential for "severe hepatoxicity (including acute hepatitis and fatal events)."[10]

Since **2011**, Levaquin's labeling has carried a "black box" warning stating: "WARNING: … Fluoroquinolones, including LEVAQUIN®, may exacerbate muscle weakness in persons with myasthenia gravis."[11]

In **2013**, the peripheral neuropathy warning in Levaquin's labeling was revised to note that "[s]ymptoms may occur soon after initiation of LEVAQUIN® and may be irreversible."[12]

## C.    Product Liability Litigation Involving Levaquin

In 2008, after Levaquin's label was changed to include a "black box" warning about tendinitis and tendon rupture, the plaintiffs' bar commenced a wave of product liability suits alleging that Levaquin had caused those symptoms.  The Judicial Panel on Multidistrict Litigation centralized those suits in the District of Minnesota.  *In re Levaquin Prods. Liab. Litig.*, 560 F. Supp. 2d 1384 (J.P.M.L. 2008).  One of the individuals who filed a complaint in that MDL was John Fratti, who is one of the six Plaintiffs here.[13]

In October 2012, after winning three of four bellwether trials, J&J entered into a global

---

[10] *See* Levaquin Label (2008) at 4, 14-16 (Knobler Decl., Ex. 10).

[11] *See* Levaquin Label (2011) at 1, 13 (Knobler Decl., Ex. 11).

[12] *See* Levaquin Label (2013) at 16, 18 (Knobler Decl., Ex. 12).

[13] *See* Compl. (Dkt. 1), *Fratti v. Johnson & Johnson*, No. 0:09-cv-00812-JRT (D. Minn. Apr. 8, 2009) (Knobler Decl., Ex. 15).

settlement with most of the plaintiffs in the Levaquin tendon MDL.[14]  Mr. Fratti chose not to participate in that settlement and dismissed his suit voluntarily.[15]

In 2009, while the federal tendon MDL was proceeding, the court system of New Jersey (J&J's home state) created a mass tort proceeding to centralize Levaquin tendon lawsuits filed at the state level.[16]  The judge overseeing that proceeding held that, since at least 2008, Levaquin's label warning concerning tendon issues was "adequate as a matter of law."[17]

In 2013, when Levaquin's label (along with that of the other fluoroquinolone drugs) was changed to strengthen the warning about peripheral neuropathy, the plaintiffs' bar began a new wave of suits alleging that fluoroquinolones had caused that condition.  The Judicial Panel on Multidistrict Litigation centralized those suits in Minnesota also.  *See In re Fluoroquinolone Prods. Liab. Litig.*, 2015 U.S. Dist. LEXIS 107667 (J.P.M.L. Aug. 17, 2015).

Plaintiffs chose not to file this suit in the MDL court, and J&J agrees with that decision.  As discussed below, Plaintiffs' complaint mentions "peripheral neuropathy" and "tendon issues"—but it does so only in passing, as part of a laundry list of over 70 other symptoms.  The complaint pleads no facts suggesting, beyond the conclusory level, that any of the six Plaintiffs (let alone all of them) actually suffers from peripheral neuropathy or tendon issues.  The conspiracy theory alleged in Plaintiffs' complaint, and the centrality of the allegations against a high-ranking government defendant, also differentiates this case from those before the MDL court.

---

[14] *See* Margaret Cronin Fisk and Beth Hawkins, *Johnson & Johnson Settles 845 Levaquin Lawsuits*, Bloomberg Business (Nov. 1, 2012), http://www.bloomberg.com/news/articles/2012-11-01/johnson-johnson-reaches-settlement-in-845-levaquin-cases.

[15] *See* Stip. of Dismissal Without Prejudice (Dkt. 17), *Fratti v. Johnson & Johnson*.

[16] *See* New Jersey Courts, *Levaquin*, http://www.judiciary.state.nj.us/mass-tort/levaquin/.

[17] *See, e.g.*, *Young v. Johnson & Johnson*, No. ATL-L-268-11 (N.J. Super. Ct. Atlantic Cnty. July 21, 2014) (applying Ohio law); *Johnson v. Johnson & Johnson*, No. ATL-L-1577-10 (N.J. Super. Ct. Atlantic Cnty. July 2, 2014) (applying Texas law); *Hain v. Johnson & Johnson*, No. ATL-L-8568-11 (N.J. Super. Ct. Atlantic Cnty. June 13, 2013) (applying New York law).

**D.      Plaintiffs and Their Alleged Injuries**

Plaintiffs are six individuals who allegedly suffered personal injuries as a result of taking Levaquin.  Although their complaint spans a full 72 pages, it says next to nothing about the circumstances in which they were allegedly injured.

For example, we are not told whether Plaintiffs' prescriptions were filled with *brand-name* Levaquin manufactured by J&J or with *generic* levofloxacin that J&J did not manufacture. The complaint side-steps this issue by lumping together Levaquin and levofloxacin in "any … form[]" and calling them all "Levaquin."  (Compl., pmbl.)

Nor are we told, beyond the most generic level, what injuries each Plaintiff allegedly suffered.  At one point in the complaint, Plaintiffs allege *collectively* that they

> suffer from a constellation of medical issues related to the following body systems: neuromuscular, neuropsychiatric, peripheral neuropathy, senses, skin, cardiovascular, plus [sic], endocrine, nutritional, metabolic and immunity; blood and blood forming organs; circulatory system; respiratory system; digestive system; genitourinary system; and connective tissue.

(Compl. ¶ 46.)  In another paragraph, Plaintiffs allege *collectively* that they

> suffered mitochondrial toxicity, neuropsychiatric adverse events, and multi-system disability …, including a constellation of medical issues [identical to the list described above]….

(Compl. ¶ 96.)  And still elsewhere, Plaintiffs allege *collectively* that they

> suffer from a constellation of medical issues, including but not limited to widespread bodily pain, fatigue, muscle weakness, muscle twitching, muscle wasting, gait disturbances, severe balance issues, stiffness, spasms, joint pain, tendon issues, seizures, tremors, numbness, burning, tingling, fasciculation, spasticity, nerve damage, autonomic issues, voice issues, exercise intolerance, difficulty swallowing, slow digestive motility, abdominal pain, acid reflux, gastritis, nausea, constipation, diarrhea, colitis, cognitive impairment, memory impairment, cardiac issues, urinary issues, kidney damage, liver damage, pancreatic damage, thyroid abnormalities, hair loss, glucose issues, respiratory issues, emotional issues, depression, psychosis, depersonalization, dissociation, anxiety, in-

> somnia, abnormal dreams, suicidal thoughts, thought alterations,
> agitation, fatigue, dizziness, inability to concentrate, panic attacks,
> difficulty communicating, forgetfulness, bruising, vision issues,
> hearing issues, tinnitus, dental issues, gum issues, skin issues,
> rashes, multiple chemical sensitivity, sexual dysfunction, reproduc-
> tive issues, and DNA damage.

(Compl. ¶ 97). The complaint does not explain which of the six Plaintiffs have experienced which of this panoply of symptoms, or how Plaintiffs know that they have suffered subcellular injuries to their "mitochondria" and "DNA."

Finally, the complaint pleads no facts plausibly suggesting that Levaquin *caused* Plaintiffs' extensive and varied list of injuries. We are not told when Plaintiffs were prescribed Levaquin. We are not told what conditions Plaintiffs were prescribed Levaquin to treat—*i.e.*, whether it was an FDA-approved use or a so-called "off-label" use. We are not told how long Plaintiffs took Levaquin, or how soon after taking Levaquin their symptoms manifested. We are not told whether Plaintiffs took other fluoroquinolones (or other drugs entirely) that could have caused their symptoms.[18] There is no allegation that any doctor has diagnosed any Plaintiff as suffering from a Levaquin-caused injury.

## E.   Plaintiffs' Conspiracy Theory

In addition their garden-variety product-liability allegations, Plaintiffs also allege a conspiracy among J&J; former FDA Commissioner Dr. Margaret Hamburg ("Dr. Hamburg"); Dr. Hamburg's husband, Peter Brown; Mr. Brown's investment company, Renaissance Technologies, L.L.C. ("Renaissance"); and two other Renaissance employees (together with Mr. Brown and Renaissance, the "Renaissance Defendants").

---

[18] The Court may take judicial notice that Plaintiff Terry Aston, when speaking at a November 2015 FDA meeting, testified that she "was prescribed Avelox followed by Levaquin and later [C]ipro." Excerpt from Minutes of Nov. 5, 2014 Joint Meeting at 254 (Knobler Decl., Ex. 13). Both Avelox and Cipro are fluoroquinolone drugs not manufactured or sold by J&J.

The nature of this conspiracy is sketchy at best.  Charitably read, the complaint alleges that Dr. Hamburg caused the FDA to refrain from taking some regulatory action with respect to Levaquin that the agency should have taken.  It is not clear exactly what that action is, or how taking that action would have prevented Plaintiffs' alleged injuries.  Dr. Hamburg allegedly acted out of corrupt self-interest, because Renaissance held stock in J&J, and she and her husband would be enriched if Levaquin succeeded and J&J's stock appreciated in value.

The complaint does not explain how J&J (either the parent company or its named subsidiaries) acted to advance this corrupt arrangement.  There is no allegation that J&J encouraged the Renaissance Defendants to purchase its (publicly traded) stock.  There is no allegation that J&J knew that Renaissance was one of its stockholders, let alone that J&J knew of any connection between Renaissance and Dr. Hamburg.  *A fortiori*, there is no allegation of any meetings, communications, or interactions between J&J and the other ostensible conspirators.

The complaint does allege, in conclusory fashion, that J&J "bribed" or "unduly influenced" Dr. Hamburg.  For example, Plaintiffs assert:

- That J&J "illegally and criminally influence[d] the Commissioner of the [FDA] to mislabel and misbrand a drug"  (Compl., pmbl.);

- That J&J "us[ed] the mail system and the wires to unduly influence the FDA and [Dr.] Hamburg" (*id.* ¶¶ 183(d), 186(e));

- That J&J "bribe[d]" Dr. Hamburg in order to "induce [her] to do or omit acts in violation of her lawful duty as FDA Commissioner" (*id.* ¶¶ 179, 183(f), 186(g));

- That J&J caused Dr. Hamburg "to violate 18 U.S.C. § 208" by participating in FDA matters relating to Levaquin in which she "ha[d] a financial interest" (*id.* ¶ 157-58);

- That J&J "violat[ed] 18 U.S.C. § 1001" by making unspecified "false, fictitious, or fraudulent statement[s]" in a "matter within the jurisdiction of" the FDA (*id.* ¶ 173);

- That, as a result of unspecified "actions and non-actions of the Defendants," "the FDA … suppressed from the public" a report "link[ing] Levaquin" to certain disease states (*id.* ¶ 103).

9

However, Plaintiffs do not explain when or how any of the alleged "bribery" or "improper influence" took place; what J&J obtained as a result; or how Plaintiffs were ultimately affected by the alleged "bribery" or "improper influence."

**F.    Plaintiffs' Causes of Action**

Based on the above factual allegations, Plaintiffs assert the following causes of action under federal statutes and state common law:

- Violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(a)-(d) (against all Defendants)

- Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (against J&J only)

- Unjust enrichment (against all Defendants)

- Negligence (against J&J only)

- Negligent design defect (against J&J only)

- Negligent misrepresentation (against J&J only)

- Breach of express warranty (against J&J only)

- Breach of implied warranty (against J&J only)

- Fraud (against J&J only)

- Fraudulent concealment/constructive fraud (against J&J only)

- Strict liability (against J&J only).

<u>**STANDARD OF REVIEW**</u>

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678.  Its concrete "factual content" must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "[C]onclusory statements" and "naked assertion[s]" are properly ignored in this

analysis.  *Id.*  If a complaint's concrete, well-pleaded facts, taken as true, establish only a "possibility" of liability, or are "merely consistent with" liability, dismissal is required.  *Id.*

The level of detail required to state a plausible claim varies with the type of case.  "[I]n a potentially complex litigation, or one that by reason of the potential cost of a judgment to the defendant creates [an] '*in terrorem*' effect," a heightened degree of substantiation is necessary.  *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  This is particularly "applicable to a RICO case."  *Id.*

In addition, a plaintiff alleging fraud or misrepresentation must plead her claim "with particularity."  Fed. R. Civ. P. 9(b).  This means that the plaintiff must state with specificity "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994); *see also Levi v. Brown & Williamson Tobacco Corp.*, 851 F. Supp. 2d 8, 12 (D.D.C. 2012) (plaintiff must specifically state "the facts misrepresented, the time, place and content of the false representations, [his] reliance on defendants' nondisclosure, and the consequences of the fraud"), *aff'd*, 528 F. App'x 4 (D.C. Cir. 2013).

## ARGUMENT

## I.   PLAINTIFFS' CLAIMS ARE BARRED TO THE EXTENT THEY ARE PREMISED ON ALLEGEDLY IMPROPER INTERACTIONS WITH THE FDA.

As discussed above, the complaint goes well beyond garden-variety product liability theories and asserts that J&J somehow corrupted the FDA's regulatory process in order to receive favorable treatment for Levaquin.  This theory is pled in purely conclusory fashion and should be dismissed for that reason alone.  However, Plaintiffs' conspiracy theory fails for an even more fundamental reason: as the Supreme Court has held, it is not the place of private plaintiffs to bring claims of this sort.

11

The FDCA, 21 U.S.C. § 301, *et seq.*, governs the FDA approval process and the manner in which manufacturers must interact with the FDA.  Not only did Congress decline to create a private right of action under the FDCA, it went further and included an express proclamation that "all … proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States" only.  21 U.S.C. § 337(a).  This provision "leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for non-compliance…."  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 (2001).

In *Buckman*, the Supreme Court held unanimously that the FDCA impliedly preempts state-law tort claims premised on a theory that the defendant defrauded the FDA or otherwise corrupted the FDA approval process.  Like the plaintiffs in this case, the *Buckman* plaintiffs alleged that they had suffered personal injury after being exposed to an FDA-approved product.  In addition to ordinary product liability theories, the *Buckman* plaintiffs advanced a novel "fraud on the FDA" theory of liability.  As the Court described it:

> Plaintiffs say [Defendant] made fraudulent representations to the [FDA] in the course of obtaining approval to market the [device]. Plaintiffs further claim that such representations were at least a "but for" cause of injuries that plaintiffs sustained from the implantation of these devices: Had the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured.  Plaintiffs sought damages from petitioner under state tort law.

*Id.* at 343-44.

The Court held that such a theory was "pre-empted by" the FDCA.  *Id.*  As it explained, "the [FDCA's] statutory scheme amply empowers" the FDA "to punish and deter fraud against the Agency."  *Id.* at 348.  Unlike private plaintiffs, federal officials have the expertise necessary to choose among various "enforcement options" in order to "make a measured response to suspected fraud upon the Agency."  *Id.* at 349.  Allowing private plaintiffs to challenge manufactur-

ers' interactions with the FDA would "inevitably conflict with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives." *Id.* at 350; *see also* Br. of United States as *Amicus Curiae* on the Merits, *Buckman v. Plaintiffs' Legal Committee*, 2000 U.S. S. Ct. Briefs LEXIS 504, at *40 (Sept. 13, 2000) ("*Buckman* FDA Br.") ("[R]espondents' fraud-on-the-FDA claims … conflict with the strong federal interest in permitting FDA to decide for itself whether it has been defrauded, and, if so, what statutorily authorized remedy to seek.").

What is more, such claims "depend on speculation as to the FDA's behavior in a counterfactual situation" without the allegedly improper influence. *Buckman*, 531 U.S. at 354 (Stevens, J., concurring).   As the FDA explained in its *amicus* brief, allowing private litigants to bring such claims "would invite highly intrusive inquiries into FDA's internal deliberations" and subject FDA officials to burdensome "discovery … concerning [their] states of mind and the courses of action that agency decisionmakers might have taken under various hypothetical scenarios." *Buckman* FDA Br. at *49.   "The prospect of such intrusive inquiries and attendant litigation would … divert[] FDA's resources from the important health mission that Congress has assigned to it and … distort[] FDA's internal decisionmaking processes." *Id.* at *51.

As courts have recognized, *Buckman*'s rationale transcends causes of action labeled "fraud on the FDA."   *See Williams v. Zimmer US, Inc.*, 2015 U.S. Dist. LEXIS 91238, at *16 (E.D.N.C. July 14, 2015) ("*Buckman* is not limited to fraud-on-the-FDA claims.").   It applies equally to other legal theories that hinge on a defendant's alleged corruption of the agency's regulatory process, *e.g.*, by submitting false information to the agency, withholding information from the agency, or bribing agency officials.   *See, e.g.*, *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 964-65 (6th Cir. 2004) (*Buckman* preempts private suits alleging that a manufacturer "inten-

tionally withheld or misrepresented material information concerning [a] drug" to FDA, or "bribed an FDA official … to secure [a] drug's approval").

Courts have also recognized that *Buckman*'s rationale extends beyond the context of federal-state preemption, and precludes claims under other *federal* statutes—including RICO—that would require similar proof of fraud on or corruption of the FDA.  *See, e.g.*, *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290 (C.D. Cal. 2008) ("[W]hat the FDCA does not create directly, RICO cannot create indirectly."), *aff'd sub nom.*, *UFCW Cent. Pa. v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010); *UFCW Unions & Emprs. Midw. Health Benefits Fund v. Walgreen Co.*, 2012 U.S. Dist. LEXIS 104315, at *7-11 (N.D. Ill. July 26, 2012) ("Since the Fund's complaint relies on [the FDCA] to support its RICO claims, [Plaintiff] has failed to state a claim"), *aff'd*, 719 F.3d 849 (7th Cir. 2013); *cf. Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1226 (D.C. Cir. 1991) (observing that "the statutory scheme for administrative relief set forth by Congress in the [Service Contract Act] leaves no room for a RICO action").

Thus, Plaintiffs' conspiracy theory—no matter what cause of action they press it under—is squarely precluded.  It is for the FDA alone to determine whether Defendants corrupted the agency's regulatory processes, and to select among the many available "enforcement options" if they determine that impropriety has occurred.  *Buckman*, 531 U.S. at 349.  Allowing Plaintiffs to litigate their conspiracy theory in this Court would intrude on the "relationship between [FDA] and … entit[ies] it regulates," *Buckman*, 531 U.S. at 347, and "invite highly intrusive" discovery into the details of FDA officials' decision-making process, *Buckman* FDA Br. at *49-51.  Such a proceeding "would raise the same inter-branch-meddling concerns that animated *Buckman*." *Garcia*, 385 F.3d at 966.

14

## II.    PLAINTIFFS' CLAIMS ARE BARRED TO THE EXTENT THEY ARE PREMISED ON "OFF-LABEL PROMOTION" OR OTHER ALLEGED VIOLATIONS OF THE FDCA.

Plaintiffs also allege that J&J has violated the FDCA in ways that do not fit as neatly into their conspiracy theory.  For example, the Complaint asserts that J&J:

- "misbranded" Levaquin in "violat[ion] of [the FDCA]" by "providing inadequate, inaccurate label information" and by promoting Levaquin for "off-label" uses (Compl. pmbl. & ¶¶ 41, 105, 143-53, 183(a), 186(b), 220, 228);

- "[v]iolat[ed] 21 U.S.C. § 331(a)(1) (Introduction of a Misbranded Drug into Interstate Commerce)" (*id.* ¶¶ 139-155);

- "violat[ed] 21 U.S.C. § 393 of the [FDCA] ensuring safe drugs" (*id.* ¶¶ 164-71).

As explained above, there is no private right of action to enforce the FDCA, and only the federal government may "file suit for noncompliance."  *Buckman*, 531 U.S. at 349; *see* 21 U.S.C. § 337(a).  Accordingly, to the extent Plaintiffs' state-law and RICO claims are premised on alleged violations of duties imposed by the FDCA, those claims must be dismissed.  *See, e.g.*, *Sprint Fidelis Leads Prods. Liab. Litig.*, 592 F. Supp. 2d 1147, 1161 (D. Minn. 2009) ("[W]hat Plaintiffs are really alleging is that [the defendant] violated the FDCA by failing to inform the FDA in a timely fashion of adverse … events.  Such a claim necessarily fails, because no private right of action exists under the FDCA.  Plaintiffs cannot make an end run around this rule by recasting violations of the FDCA as violations of state common law."), *aff'd*, 623 F.3d 1200, 1204-06 (8th Cir. 2010) ("[T]hese claims are simply an attempt by private parties to enforce the [FDCA], claims foreclosed by § 337(a) as construed in *Buckman*."); *Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 36-39 (D.D.C. 2003) ("Plaintiffs argue that if defendant had adhered to [FDA] requirements regarding … adverse incident reporting, … [they] would not have been injured.  This is precisely the type of claim barred by [*Buckman*].").

15

A few words about "off label" promotion are appropriate. "An 'off-label' prescription is one written for a purpose that has not been approved by the [FDA]." *United States v. King-Vassel*, 728 F.3d 707, 709 (7th Cir. 2013). To the extent Plaintiffs' claims are based on allegations that J&J promoted Levaquin for off-label uses, they must be dismissed for the simple reason that Plaintiffs do not claim to have taken Levaquin for off-label uses. Absent such an allegation, Plaintiffs' assertions about off-label promotion are "irrelevant." *Rollins v. Wackenhut Servs.*, 802 F. Supp. 2d 111, 124 n.9 (D.D.C. 2011), *aff'd*, 703 F.3d 122 (D.C. Cir. 2012).

Regardless, Plaintiffs' allegations of off-label promotion would fail to state a claim. "The FDCA … do[es] not expressly prohibit the 'promotion' or 'marketing' of drugs for" so-called "off-label" uses. *United States v. Caronia*, 703 F.3d 149, 154-55 (2d Cir. 2012). The FDA asserts that such a prohibition is implicit in the statute. That interpretation is now in doubt, as it is in tension with commercial speech rights. *See id.* at 168-69 (holding that, under the First Amendment, "the government cannot" prohibit true statements by manufacturers "promoting … off-label use"); *Dawson v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 112877, at *17 (D.S.C. Aug. 9, 2013) ("This court is not convinced that off-label promotion violates the FDCA.").

In any event, even assuming "off-label" *promotion* violates the FDCA, off-label *prescription* and *use* of drugs is entirely lawful. In drafting the FDCA, Congress "went out of [its] way to protect the liberty of doctors and patients to use approved [drugs] in any manner they wish—including off-label." *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1344 (10th Cir. 2015). In fact, about 21% of all U.S. prescriptions are "for off-label purposes" (and in some fields, up to 90%). *Amarin Pharma, Inc. v. FDA*, 119 F. Supp. 3d 196, 2015 U.S. Dist. LEXIS 103944, at *9-10 (S.D.N.Y. Aug. 7, 2015). This is because "FDA-approved uses often lag behind knowledge about actual effective treatment." *Layzer v. Leavitt*, 770 F. Supp. 2d 579, 586 (S.D.N.Y. 2011).

16

Indeed, the Supreme Court has "recognize[d] the value and propriety of off-label use," noting that it is "widespread" and "often … essential to giving patients optimal medical care." *Buckman*, 531 U.S. at 350, 351 n.5.

"Off-label," in other words, is nothing more than an "administrative/legal status" under the FDCA, and implies nothing "about … safety or effectiveness." James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71, 84 (1998). The very notion "exists only as a creation of the FDCA scheme." *Hawkins v. Medtronic, Inc.*, 2014 U.S. Dist. LEXIS 11779, at *51 (E.D. Cal. Jan. 30, 2014). Because enforcing that scheme is entrusted to the FDA alone, private plaintiffs are precluded from suing on allegations of "off-label" marketing or promotion—whether such a claim is brought directly under the FDCA, or under the guise of state tort law. As one court explained:

> [P]laintiff's claim may be based upon alleged misrepresentations and omissions regarding defendants' practice of promoting and marketing to physicians the off-label use of the Infuse Device …. [T]his basis for a fraudulent misrepresentation/fraud in the inducement claim is impliedly preempted under *Buckman* and § 337(a) …. [Such a] claim is not based on conduct that would give rise to a recovery under state law even in the absence of the FDCA …. To determine whether said conduct is improper would require reliance on the requirements of the FDCA. Further, *even the concept of "off-label use" is a creature of the FDCA, is defined by the FDCA, and is not a part of [state] substantive law*. While plaintiff couches her claim as a state law fraudulent misrepresentation/fraud in the inducement claim, this claim is in substance a claim for violating the FDCA and, thus, is clearly preempted under *Buckman* and § 337(a).

*Caplinger v. Medtronic, Inc.*, 921 F. Supp. 2d 1206, 1219-20 (W.D. Okla. 2013) (emphasis added), *aff'd*, 784 F.3d 1335 (10th Cir. 2015); *see also Wright v. Medtronic, Inc.*, 81 F. Supp. 3d 600, 612 (W.D. Mich. 2015) ("[The] lack of a traditional state-law duty to refrain from off-label promotion means that Plaintiff's failure-to-warn claim … is also impliedly preempted."); *Hawkins*, 2014 U.S. Dist. LEXIS 11779, at *51 ("The general allegation that Defendants were negli-

17

gent for promoting INFUSE® off-label must fail as impliedly preempted because [that] claim 'exist[s] solely by virtue of the FDCA … requirements.'" (quoting *Buckman*)).

## III.   PLAINTIFFS LACK STANDING TO SUE UNDER THE LANHAM ACT.

Plaintiffs allege that J&J violated the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by making "false and/or misleading statements" that "deceived and/or had the capacity to deceive consumers." (Compl. ¶ 303.)  But it is black-letter law that consumers such as Plaintiffs lack standing to sue under that statute.  "[T]o come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a *commercial* interest in *reputation or sales*.  A consumer who is hoodwinked into purchasing a disappointing product … cannot invoke the protection of the Lanham Act."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014) (emphasis added).  This claim must be dismissed.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER RICO.

"[T]he civil provisions of RICO are [among] the most misused statutes in the federal corpus of law."  *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000).  "Congress did not intend for RICO to be used by private plaintiffs to claim treble damages for ordinary and routine tort causes of action," *e.g.*, "products liability case[s] involving alleged false representations."  *Morrison v. Syntex Labs., Inc.*, 101 F.R.D. 743, 744-45 (D.D.C. 1984); *see Summit Props., Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 557 (5th Cir. 2000) ("Today we are invited to read RICO as establishing a federal products liability scheme complete with treble damages and attorney fees …. We are unpersuaded that RICO can be extended so far….").

The Renaissance Defendants' brief explains in detail why Plaintiffs fall far short of stating a claim under any subsection of RICO.  *See* Renaissance Defendants' Br., Part I-II.  Among other things, Plaintiffs fail to plead the sort of injury to "business or property" that RICO re-

18

quires; fail to plead a qualifying "pattern of racketeering activity"; fail to plead either "but-for" or proximate causation; fail to plead a cognizable RICO "enterprise"; and fail to plead the individual elements required by each subsection of 18 U.S.C. § 1962.

All of the RICO arguments raised by the Renaissance Defendants apply equally to Plaintiffs' RICO claims against J&J.  To avoid repetition, J&J joins in those arguments and incorporates them by reference here.  In this brief, J&J offers brief supplemental remarks to emphasize Plaintiffs' failure to plead qualifying "racketeering activity" and causation.

### A.    Failure To Plead a Pattern of Racketeering Activity

Many of the acts that Plaintiffs allege form a "pattern of racketeering activity" are not cognizable predicate acts under RICO at all, because they do not appear in the "specified list" of predicate acts in 18 U.S.C. § 1961(1)(B) that qualify as "racketeering."  *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992).  Significantly, this includes violations of the FDCA, *e.g.*, "Introduction of a Misbranded Drug into Interstate Commerce" (Compl. at p. 31) and "Violation of 21 U.S.C. § 393 of the Food, Drug, and Cosmetic Act" (*id.* at p. 36).  Moreover, as discussed above, violations of the FDCA cannot give rise to a RICO claim for the additional reason that the FDA alone is authorized to bring suit to remedy FDCA violations.

With the alleged FDCA violations out of the picture, all that remains of Plaintiffs' RICO claims are the purely conclusory allegations that J&J somehow "conspired" with Dr. Hamburg to violate public employee ethics laws (Compl. ¶ 157); that J&J somehow "bribed" Dr. Hamburg (*id.* ¶ 179); that J&J made unspecified uses of the mails and wires to defraud (*id.* ¶¶ 181-186); and that J&J somehow laundered money or transported stolen funds (*id.* ¶¶ 187-89).  However, like the allegations against the Renaissance Defendants, these "predicate acts" are pleaded in such a threadbare fashion that J&J is unable to respond to them.  *See Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990) ("[I]n pleading [RICO] predicate acts conclusory allegations that var-

19

ious statutory provisions have been breached are of no consequence…."). Still less are they pled with "particularity" in accordance with Rule 9(b), as circuit precedent requires. *See Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015).

### B.    Lack of "But-For" And Proximate Causation

Only someone injured "by reason of" a RICO violation may sue. 18 U.S.C. § 1964(c). This language imposes both a "but-for" and a proximate causation requirement. *Holmes v. SIPC*, 503 U.S. 258, 265-66, 268 (1992). Plaintiffs plead neither.

To satisfy RICO's "but-for" causation requirement, the plaintiff must show that, absent the defendant's racketeering activity, the claimed injury would not have occurred. Notably, the injury must stem not just from the defendant's conduct *in general*, but from the defendant's specified indictable *predicate acts of racketeering. Beck v. Prupis*, 529 U.S. 494, 495-96 (2000). This means that it is not sufficient for Plaintiffs to allege that they were injured by taking Levaquin. Rather, Plaintiffs must allege that they were injured by one of the specific criminal acts that (if properly pled) could serve as an instance of "racketeering" under RICO.

The complaint, however, utterly fails to explain how J&J's alleged acts of racketeering (bribery, money laundering, transporting of stolen funds, etc.)—or indeed, *any* Defendant's alleged acts of racketeering—caused Plaintiffs any injury. Again, we are not told when Plaintiffs took Levaquin or when J&J committed the alleged predicate acts, so the complaint does not even permit the inference that the predicate acts *came first*. Still less is there any attempt to trace a causal chain between any predicate act and any injury to Plaintiffs. Even assuming the complaint pleaded coherently that J&J improperly influenced Dr. Hamburg to refrain from taking some regulatory action with respect to Levaquin—*e.g.*, requiring a stronger warning as to some condition—there is nothing in the complaint to suggest that Plaintiffs would not have taken Levaquin and suffered injury if that particular at warning had been required at the relevant time.

*See Dist. 1199P Health & Welfare Plan v. Janssen L.P.*, 784 F. Supp. 2d 508, 523-24 (D.N.J. 2011) (dismissing RICO claim where complaint "fail[ed] to allege the connection between Defendants' [predicate acts] and Plaintiffs' injuries"); *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1053 (N.D. Cal. 2009) ("The court will not make the unsupported inference that the individual plaintiffs purchased the drug as a result of defendants' [predicate acts]."), *aff'd*, 464 F. App'x 651 (9th Cir. 2011).

Even if Plaintiffs had sufficiently pled "but-for" cause, that would not be enough. RICO's proximate-cause requirement "demand[s]" a "*direct* relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268-69 (emphasis added); *see also Anza v. Ideal Supply Corp.*, 547 U.S. 451, 457-61 (2006) ("the alleged violation [must have] led directly to the plaintiff's injuries"). In other words, RICO liability does not "go beyond the first step" in the causal chain. *Holmes*, 503 U.S at 271; *see also Hemi Grp. v. City of New York*, 559 U.S. 1, 9-10 (2010) (plurality) (plaintiff's "theory of causation" may not involve more than one "step"); *Mendelovitz v. Vosicky*, 40 F.3d 182, 185 (7th Cir. 1994) (no proximate cause where causal chain "pass[ed] through many intermediaries" and plaintiff's damages "require[d] actions and decisions by third parties before coming into being"). In the RICO context, at least, mere "foreseeability" is not enough to establish proximate cause. *Hemi*, 559 U.S. at 12; *SEIU Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1076 (D.C. Cir. 2001).

"The role of the prescribing physician" in the causal chain is especially "problematic" in a RICO case. *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 80758, at *22-26 & n.9 (S.D. Ill. Aug. 5, 2010). This is because "the prescribing decisions of physicians are based on so many factors as to defy any efforts to categorically attribute them to a particular cause." *Sergeants Benevolent Ass'n Health & Welfare*

*Fund v. Sanofi-Aventis U.S. LLP*, 20 F. Supp. 3d 305, 322-23 (E.D.N.Y. 2014), *aff'd*, 806 F.3d 71 (2d Cir. 2015).   Courts therefore find proximate cause lacking in RICO cases where a physician's decision to prescribe a drug was a precursor to the plaintiff's alleged injury.[19]

## V.   PLAINTIFFS' PRODUCT LIABILITY CLAIMS FAIL ON THE MERITS.

Plaintiffs assert a raft of common-law claims against J&J under the laws of no particular state.   Because the complaint does not allege Plaintiffs' place of residence or injury, the only jurisdiction with an apparent interest in these common-law claims is J&J's home state (New Jersey).   The District of Columbia has no significant interest in applying its own laws merely because Plaintiffs chose to sue here.   *See Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1045-46 (D.C. Cir. 2010).   But Plaintiffs' common-law claims fail under the laws of either jurisdiction.[20]

### A.   Displacement by the New Jersey Products Liability Act

In lieu of the grab-bag of common-law theories alleged by Plaintiffs, New Jersey recognizes just "one unified, statutorily defined theory of recovery for harm caused by a product."   *In re Lead Paint Litig.*, 924 A.2d 484, 503 (N.J. 2007).   That statute—the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-1 *et seq.*—"encompass[es] virtually all possible causes of action relating to harms caused by … products," *id.*, other than claims for breach of

---

[19] *See, e.g.*, *Sergeants Benevolent*, 20 F. Supp. 3d 305; *Emp'r Teamsters-Local Nos. 17/505 Health Welfare Trust Fund v. Bristol Myers Squibb Co.*, 2013 U.S. Dist. LEXIS 21589 (S.D. W. Va. Jan. 29, 2013); *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010); *Yasmin & Yaz*, 2010 U.S. Dist. LEXIS 80758; *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270 (S.D. Fla. 2009), *aff'd*, 444 F. App'x 401 (11th Cir. 2011); *Actimmune*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011); *Dist. 1199P Health & Welfare Plan v. Janssen*, 2008 U.S. Dist. LEXIS 103526 (D.N.J. Dec. 23, 2008), *subsequent order*, 784 F. Supp. 2d 508 (D.N.J. 2011); *In re Epogen & Aranesp Off-Label Mktg. Sales Practices Litig.*, 590 F. Supp. 2d 1282 (C.D. Cal. 2008), *subsequent order*, 2009 U.S. Dist. LEXIS 58697 (C.D. Cal. June 17, 2009), *aff'd sub. nom. UFCW Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010).

[20] J&J reserves the right to argue that the laws of another jurisdiction apply in the event Plaintiffs' claims are not dismissed or additional facts come to light.

express warranty, *see* N.J. Stat. Ann. § 2A:58C-1b(3).  Thus, "if the facts of a case suggest that the claim is about defective manufacture, flawed product design, or failure to give an adequate warning, then the [NJ]PLA governs and the other claims are subsumed."  *New Hope Pipe Liners, LLC v. Composites One, LCC*, 2009 U.S. Dist. LEXIS 11217, at *7-8 (D.N.J. Nov. 30, 2009).

Here, because New Jersey is the only jurisdiction identified in the complaint with any meaningful interest in this litigation, the NJPLA applies.  Plaintiffs' state-law claims other than express warranty are all clearly subsumed and must be dismissed.  *Cf. Sinclair v. Merck & Co.*, 948 A.2d 587, 596 (N.J. 2008) (where "[t]he heart of plaintiff's case [was] the potential for harm caused by Merck's drug," plaintiff's claims "clearly [fell] within [the NJPLA's] scope"); *Lead Paint*, 924 A.2d at 503-04 (where "the central focus of [the] complaint [was] that defendants were aware of dangers associated with [their product] … and failed to warn of those dangers," this fell "squarely within the [ambit of] the [NJ]PLA").

Plaintiffs may argue that they should be permitted to amend their complaint to add a claim under the NJPLA.  But that would be a futile act.  The NJPLA provides:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J. Stat. Ann. § 2A:58C-2.  In other words, the NJPLA recognizes only three theories of liability: (1) defective manufacture, (2) inadequate warning, and (3) defective design.  As discussed below, Plaintiffs do not state a claim under any of these theories.  Accordingly, addition of an NJPLA count to the complaint would not cure Plaintiffs' failure to plead an actionable claim.

B.       **Failure To Plead Causation With Plausibility**

It goes without saying that all of Plaintiffs' state-law claims require, at minimum, an injury caused by a product manufactured by one of the J&J companies sued here.  However, the complaint fails to plead causation beyond the conclusory level, and is therefore deficient under *Iqbal*.  *See A.G. v. Elsevier, Inc.*, 732 F.3d 77, 81-82 (1st Cir. 2013) (affirming dismissal under *Iqbal* in light of complaint's "paucity of factual content bearing on causation").

For starters, as noted above, the complaint fails to plead beyond the conclusory level that Plaintiffs' prescriptions were filled with *brand-name* Levaquin manufactured by J&J, rather than *generic* levofloxacin manufactured and sold by one of the many parties who have FDA's approval to do so.  "[T]he overwhelming national consensus … is that a brand-name manufacturer cannot be liable for injuries caused by the ingestion of the generic form of a product."  *Guarino v. Wyeth*, 719 F.3d 1245, 1251-53 (11th Cir. 2013) (collecting cases); *see also Johnson v. Teva Pharms. USA, Inc.*, 758 F.3d 605, 614-16 (5th Cir. 2014); *Foster v. Am. Home Prods. Corp.*, 29 F.3d 165, 171 (4th Cir. 1994).

Plaintiffs lump together Levaquin and levofloxacin in "any … form[]" and call them all "Levaquin" throughout the complaint.  (Compl., pmbl.)  But definitional tricks cannot satisfy *Iqbal*—especially where, as here, the surrounding circumstances raise doubt that Plaintiffs received brand-name Levaquin.  As noted above, Levaquin "went generic" in 2011.  The Court may take judicial notice, as a common-sense fact of life, that once a cheaper generic medicine enters the market, insurers and pharmacies overwhelmingly fill prescriptions with it.[21]  Indeed, as noted above, sales of name-brand Levaquin cratered promptly after generic levofloxacin entered

---

[21] *See, e.g.*, Melly Alazraki, *The 10 Biggest-Selling Drugs That Are About to Lose Their Patent*, Daily Finance (Feb. 27, 2011) ("Once [name-brand] drugs lose patent protection, lower-price generics quickly siphon off … their sales.").

the market.  The odds are therefore overwhelming that anyone who was prescribed levofloxacin within the statute of limitations window received the generic version, and not J&J's.[22]

Even assuming each of the Plaintiffs took name-brand Levaquin, the complaint is entirely vague as to the nature of each Plaintiff's injury and why he or she believes that Levaquin was the cause of that injury.  As discussed above, Plaintiffs do not say anything at all about their course of treatment, or whether their injuries manifested soon after taking Levaquin or many years later.  The complaint merely provides a laundry list of symptoms—a list so long and diverse that it is suspicious on its face—and concludes, without more, that Levaquin caused the Plaintiffs *collectively* to suffer those symptoms.  This does not suffice.  *See, e.g.*, *McElroy v. Amylin Pharms., Inc.*, 573 F. App'x 545, 545-46 (6th Cir. 2014) (dismissing complaint that "ha[d] little to say in support of [its] assertion that Byetta caused [plaintiff's] injuries," including lack of a plausible timeline of injury, lack of a professional diagnosis that Byetta caused plaintiff's injuries, and differences between the symptoms alleged and those mentioned in an FDA alert).

**C.       Manufacturing Defect Theory**

The complaint alleges, in purely conclusory fashion, that J&J breached some duty to Plaintiffs in connection with the "manufacture" of Levaquin.  (*See, e.g.*, Compl. ¶¶ 227-28, 235-37.)  But it pleads absolutely no facts suggesting that the Levaquin doses administered to Plaintiffs deviated from J&J's intended design specifications in any way.  Accordingly, to the extent the complaint could be construed to advance a claim under a manufacturing defect theory, any such claim is facially inadequate and must be dismissed.  *See Rollins*, 802 F. Supp. 2d at 122

---

[22] J&J notes that someone named Ester Schulkin—whose name matches perfectly with that of one of the Plaintiffs—posted on an Internet message board devoted to fluoroquinolone complaints: "When I contacted [a lawyer] I was told that since ***my prescription was generic*** they were not taking my case—seems generics companies are not liable?"  Comment of Ester Schulkin dated Nov. 26, 2013, *Legal Compensation for Fluoroquinolone Toxicity* (Knobler Decl., Ex. 14).

(dismissing manufacturing defect claim where "[t]here [were] no facts alleged that would appear to relate to manufacturing defects in the Abilify doses taken by [plaintiff]"); *Guidry v. Janssen Pharms., Inc.*, 2016 U.S. Dist. LEXIS 18966, at \*14 (E.D. La. Feb. 17, 2016) (same, where "[n]one of the specific facts alleged by the plaintiff suggest that the Invokana medication she ingested deviated from the specifications or intended design of the drug").

### D.     Design Defect Theory

Certain of Plaintiffs' common-law claims are based, in whole or in part, on the theory that Levaquin is defectively designed.  This theory would impose liability on J&J for failing to adopt a design for Levaquin other than the design that the FDA has approved—something that the FDCA prohibits.  Accordingly, it is preempted by federal law.

In *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466 (2013), the Supreme Court addressed the intersection of state-law design-defect claims like Plaintiffs' and the FDCA's regulatory scheme.  The Court held that "that state-law design-defect claims … that place a duty on manufacturers to render a drug safer by … altering its composition … are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition…." *Id.* at 2479.  In other words, "[c]reating an alternative [safer] design would, by its very essence, require changing the composition of the drug, which is prohibited by federal law." *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868, 875 (N.D. Ohio 2014) (citing *Bartlett*).  Such claims are therefore precluded under the doctrine of "impossibility preemption," which applies "where it is 'impossible for a private party to comply with both state and federal requirements.'" *Bartlett*, 133 S. Ct. at 2473.

*Bartlett* itself involved a generic drug, not a brand-name drug like Levaquin.  But the Court spoke broadly about all FDA-approved drugs, "whether generic or brand-name." *Id.* at 2471.  And, in the wake of *Bartlett*, lower courts have not hesitated to apply its reasoning to brand-name drugs as well, citing the decision for the broad proposition that "state-law causes of

26

action for the alleged defective design of a drug regulated and approved by the FDA [are] preempted by federal law." *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164, 169 (W.D.N.Y. 2014); *see, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015) ("[T]o the extent Yates argues that defendants should have altered the formulation of ORTHO EVRA …, we find this claim clearly preempted.").

Even if Plaintiffs' design-defect theory were not preempted, it fails for two additional reasons. First, when it comes to prescription drugs such as Levaquin, the so-called "unavoidably unsafe product" doctrine applies. That doctrine recognizes that *virtually all* prescription drugs entail some unavoidable risks—indeed, that is why they are available only with a prescription in the first place. Therefore, as long as the product is "properly prepared [*i.e.*, free of manufacturing defects] and accompanied by proper directions and warning, [it] is not defective, nor is it unreasonably dangerous." *Rollins*, 802 F. Supp. 2d at 123 (quoting Restatement (Second) Torts § 402 8, cmt. k). Stated otherwise, when it comes to prescription drugs, a manufacturer's only duties are to avoid manufacturing defects and to provide a proper warning.

And second, even if the "unavoidably unsafe" doctrine did not apply, Plaintiffs' design-defect theory is not pleaded with the plausibility required by Rule 8(a) and *Iqbal*. To "plead sufficient, non-conclusory allegations to establish a design defect claim," a complaint must contain "specific allegations" showing "that the risks of [the product] outweigh its benefits" and that "there was [an] equally effective alternative design or manner of increasing the safety of the product" without compromising its efficacy. *Rollins*, 802 F. Supp. 2d at 123. Because the complaint fails to plead such facts beyond the conclusory level, "the allegation that the drug is 'un-

27

reasonably dangerous' and hence defective is merely a legal conclusion." *Id.* at 123-24.[23]

### E.      Failure-To-Warn Theory

Some of Plaintiffs' causes of action allege that J&J failed to warn of Levaquin's risks. (*See, e.g.*, Compl. ¶ 294 ("warnings, instructions and directions accompanying Levaquin failed to warn of the dangerous risks posed by Levaquin").)  To plead a failure-to-warn claim consistent with *Iqbal*, more than a bare allegation of this nature is required.

Among other things, to plead that an inadequate warning was the cause of his or her injury, a plaintiff must plead *when* he or she was prescribed the drug in question, *what* warnings were and were not included in the labeling at the time, and *why* those warnings were insufficient with respect to the injury that the plaintiff suffered.  *See Batchelor v. Pfizer, Inc.*, 2013 U.S. Dist. LEXIS 103974, at *6-7 (M.D. Ala. July 25, 2013) (dismissing failure-to-warn claim where plaintiff failed to allege when she took the drug or what the label said at the time; a court "cannot assess the adequacy of the warning … without knowing what—if any—warning appeared"); *Tsavaris v. Pfizer, Inc.*, 2016 U.S. Dist. LEXIS 11465, at *7-9 (S.D. Fla. Feb. 1, 2016) (dismissing failure-to-warn claim where complaint "fail[ed] to identify what risks the [manufacturer] actually warned of, including whether those warnings accompanied the Prempro [plaintiff] received, and exactly how those warnings should have been rewritten" to prevent her injury).

This concern is heightened in the present case, because Plaintiffs allege a collective laundry list of symptoms, many of which J&J indisputably *did* warn about in Levaquin's labeling. For instance, Plaintiffs' collective list of symptoms includes seizures, tremors, depression, psy-

---

[23] Notably, a drug's risk/benefit balance depends heavily on the nature of the condition the drug is prescribed to treat.  For example, a drug with serious side effects might be worth the risk for diseases like plague and anthrax, but not for the common cold.  Yet the complaint is silent as to what conditions Plaintiffs received Levaquin to treat.  Without even this basic information, any assertion regarding the risk/benefit calculus is purely speculative.

choses, anxiety, confusion, rashes, tendon issues, blood glucose issues, and dizziness (warned about in Levaquin's labeling since at least 1998); vision issues (warned about since 2000); peripheral neuropathy (warned about since 2004); gait abnormality (warned about since 2007); and muscle weakness (warned about since 2011).[24]   As discussed above, courts have held some of these warnings "adequate as a matter of law."[25]   Without specifying precisely which injuries each Plaintiff experienced and when, the complaint fails to show beyond the speculative level that J&J's label warnings were in fact defective as to that Plaintiff.

Finally, to establish causation in a failure-to-warn case, a complaint must show that a different warning would have prevented the plaintiff's injury by causing his physician to refrain from prescribing the drug.  *See Dyson v. Pharmacia & Upjohn Co.*, 21 F. App'x 2, 2 (D.C. Cir. 2001); *Patteson v. Astrazeneca, LP*, 876 F. Supp. 2d 27, 34 (D.D.C. 2012).  Courts reject complaints that fail to allege this crucial link in the causal chain, or that allege it only in conclusory fashion.  *See Allain v. Wyeth Pharms., Inc.*, 2015 U.S. Dist. LEXIS 4073, at *17 (N.D. Ala. Jan. 14, 2015) (dismissing plaintiff's claims where "Plaintiff vaguely allege[d] that 'prescribing physicians' generally were misled about amiodarone" but "fail[ed] to specifically allege that *[his] prescribing physicians* were misled and how they were misled"); *Smith v. Bristol-Myers Squibb Co.*, 2009 U.S. Dist. LEXIS 121062, at *36-37 (D.N.J. Dec. 30, 2009) (dismissing case where "[n]ot only [did] Plaintiff fail[] … to plead the alleged false representations relied upon by his prescribing physician, Plaintiff [did] not even identif[y] his prescribing physician").

Here, the Complaint alleges, in conclusory fashion, that "[h]ad they been aware of said facts, Plaintiffs' prescribing physicians would not have prescribed Levaquin."  (Compl. ¶ 252.)

---

[24] *See* Background, Part B, *supra*.

[25] *See supra* note 17.

But this is nothing more than a rote recitation of the causation element of a failure-to-warn claim. That is insufficient to state a plausible claim for relief.

### F.  Other Product Liability Theories

The complaint may arguably be construed to assert other, more exotic product-liability theories, such as inadequate "research," "pre-market testing," "post-market surveillance," and conduct of "clinical trials."  (Compl. ¶¶ 227, 228.)  These are not cognizable liability theories under the NJPLA, which, as discussed above, recognizes only three types of claims: manufacturing defect, warning defect, and design defect.  *See* Part V.A, *supra*.  The same is true under the laws of the District of Columbia, to the extent they are held to apply.  *See Rollins*, 802 F. Supp. 2d at 121 ("[A] product may be found defective … if it has one of three shortcomings: (1) a manufacturing defect; (2) an absence of sufficient warnings or instructions; or (3) an unsafe design." (quoting *Warner Fruehauf Trailer Co. v. Boston*, 654 A.2d 1272, 1274 (D.C. 1995))).[26]

Furthermore, to the extent the complaint intends to assert these as freestanding theories of liability, they are pleaded in purely conclusory fashion and must be dismissed for that reason. And to the extent these theories are based on alleged noncompliance with statutory obligations imposed by the FDCA (*e.g.* the manufacturer's duty of post-market surveillance), these claims are preempted for the reasons described above.  *See* Parts I-II, *supra*.

### G.  Fraud/Misrepresentation Theories

In several of their causes of action, Plaintiffs allege that J&J made fraudulent or negligent statements or omissions that contributed to their injury.

---

[26] As other courts have observed, "a manufacturer's duty to inspect and test [its products] is not a separate cause of action," but rather, "a subpart of a manufacturer's duty to design a product with reasonable care, and is thus subsumed in the plaintiffs' claims for defective design and failure to warn."  *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 730-31 (Fla. App. 1991).

> [A] plaintiff states a claim for common law fraud by alleging "(1) a
> false representation (2) made in reference to a material fact, (3)
> with knowledge of its falsity, (4) with the intent to deceive, and (5)
> an action that is taken in reliance upon the representation." The el-
> ements of a claim of negligent misrepresentation are similar, ex-
> cept that they do not include the scienter requirements of a fraud
> claim: the plaintiff must show that the defendant "made a false
> statement or omitted a fact that he had a duty to disclose," that the
> false statement or omission "involved a material issue," and that
> the plaintiff "reasonably relied upon the false statement or omis-
> sion to [her] detriment."

*Parr v. Ebrahimian*, 774 F. Supp. 2d 234, 240 (D.D.C. 2011).

All fraud and misrepresentation claims—whether intentional or negligent in nature—must be pleaded with particularity in conformance with Fed. R. Civ. P. 9(b).  *See Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 254 (D.D.C. 2004) ("failure to satisfy the pleading requirements of Rule 9(b) would be fatal to the plaintiff's claim of negligent misrepresentation"); *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 101 n.15 (D.D.C. 2003) (citing cases).  Rule 9(b), again, requires Plaintiffs to state with specificity "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."  *Kowal*, 16 F.3d at 1278.

Here, the complaint's fraud and misrepresentation theories fall far short of satisfying Rule 9(b).  Indeed, they do not even meet the lower bar of *Iqbal* and Rule 8(a).  The allegations of misrepresentations and omissions are utterly conclusory, containing no detail as to time and place; no detail as to content beyond vague generalities; and no detail as to "what was retained or given up as a consequence of the fraud."  *See* Compl. ¶ 247 ("Defendants made representations that Levaquin was safe to Plaintiffs, Plaintiffs' prescribing physicians, Plaintiffs' healthcare providers, and the healthcare industry"); *id.* ¶ 258 ("The false information supplied by Defendants to Plaintiffs … was that Levaquin was safe, and would not harm or adversely affect patients'

31

health, including Plaintiffs"); *id.* ¶ 275 ("Defendants made misrepresentations and actively con-cealed adverse information").  In fact, the complaint's factual recitation does not plausibly sug-gest that Plaintiffs received and relied on any statements by J&J whatsoever.

This is clearly insufficient.  *Cf. Anderson*, 221 F.R.D. at 255 (dismissing negligent mis-representation claim because it left defendant "clueless as to the time, place, and content of its alleged misrepresentations or omissions"); *Tsavaris*, 2016 U.S. Dist. LEXIS 11465, at *15-16 ("Tsavaris, however, does not specify whether [the misstatement] was [on] the package insert distributed with the Prempro she received from Dr. Schwartzbard.  Nor does she state whether Dr. Schwartzbard relied on this statement in prescribing her the drug.  By failing to allege critical facts like when the misrepresentation was made, as well as the context in which the statement was made, Tsavaris fails to state a claim for negligent misrepresentation….").

In addition, to the extent Plaintiffs' fraud/misrepresentation theory is based on *omissions*, it fails because Plaintiffs have not pleaded facts giving rise to a duty to disclose.  "[M]ere silence does not constitute fraud unless there is a duty to speak."  *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015).  "[A] duty to speak arises in the fraud context only when there is some special relationship or contact between the parties justifying the imposition of a duty."  *Jef-ferson v. Collins*, 905 F. Supp. 2d 269, 287 (D.D.C. 2012).  "Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship," except where the defendant has "ma[de] a partial disclosure [that] conveys a false impression."  *Id.*  Clearly J&J was not Plaintiffs' fiduciary, and no "partial disclosures" are alleged.  *See id.* ("In fact, the plaintiffs do not allege *any* contact with the Renovator Defendants prior to closing on the Property. The amended complaint therefore provides no basis for imposing a duty to speak….").

### H.     Breach of Express Warranty

An express warranty is "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  D.C. Code § 28:2-313 (2016); N.J. Stat. § 12A:2-313 (2016).  "In order to succeed on a breach of warranty claim, a plaintiff must prove … that the defendant breached an express promise made about the product sold."  *Witherspoon v. Philip Morris, Inc.*, 964 F. Supp. 455, 464 (D.D.C. 1997).

Here, Plaintiffs do not plead, beyond the conclusory level, that J&J made any express "affirmation" or "promise" that they saw and relied upon in deciding to purchase or use Levaquin.  The complaint simply states: "Defendants expressly warranted that Levaquin was safe."  (Compl. ¶ 263.)  But Plaintiffs do not quote or point to any statement that J&J *actually made to Plaintiffs* about Levaquin's safety.

This requires dismissal.  *See Guidry*, 2016 U.S. Dist. LEXIS 18966, at *14 ("The plaintiff claims that the defendants expressly warranted that Invokana was safe …. Yet, she fails to allege facts suggesting that she was ever informed of the express warranty or that it induced her to use Invokana."); *Simoneau v. Stryker Corp.*, 2014 U.S. Dist. LEXIS 43137, at *45 (D. Conn. Mar. 31, 2014) ("[A] breach of express warranty claim without any reference to the underlying representation lacks plausibility."); *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 722-23 (D.N.J. 2011) (plaintiff cannot rely on "bald assertions" and must "identify specific affirmations by defendant that could be found to constitute an express warranty"); *Witherspoon*, 964 F. Supp. at 465 ("This claim must be dismissed … because Plaintiff can point to no promise made by Defendant.  Although Plaintiff argues that Defendant's advertisements and promotional statements 'contained broad claims *amounting* to a warranty that Defendant's cigarettes were not addictive…,' this is insufficient under an express warranty claim.").

33

Moreover, Plaintiffs fail to plead that they provided pre-litigation notice of the alleged breach. "[A] buyer must within a reasonable time after he discovers … any breach [of warranty] notify the seller of breach or be barred from any remedy." N.J. Stat. Ann. § 12A:2-607(3)(a); D.C. Code § 28:2-607(3). This pre-suit notice requirement is a "condition precedent to filing any suit" for breach of warranty, and "any complaint alleging a breach" must plead that the condition has been satisfied. *JOC, Inc. v. Exxonmobil Oil Corp.*, 2010 U.S. Dist. LEXIS 32305, at *14-16 (D.N.J. Apr. 1, 2010); *see also Kury v. Abbott Labs, Inc.*, 2012 U.S. Dist. LEXIS 4862, at *21-22 (D.N.J. Jan. 17, 2012). "Generalized allegations that [the defendant] knew" about a problem do not suffice; rather, the plaintiff must actually "allege[] in the Complaint that [she] *notified*" the defendant that she "believed [the warranty] had been breached." *JOC*, 2010 U.S. Dist. LEXIS 32305, at *16 (emphasis added). Plaintiffs' failure to plead that they satisfied this condition precedent also requires dismissal of their warranty claims.

## I.  Breach of Implied Warranty

Plaintiffs appear to sue for breach of the UCC's implied warranties of merchantability and/or fitness for a particular purpose. (Compl. ¶¶ 268-70.) As discussed above, implied warranty is not a viable cause of action in a product liability case under New Jersey law. The same thing is true under District of Columbia law, which requires plaintiffs to pursue product-liability claims under a tort theory, if at all. *See Jenkins v. WMATA (In re Fort Totten Metrorail Cases)*, 793 F. Supp. 2d 133, 152 (D.D.C. 2011) ("[C]laims of strict products liability and breach of implied warranty are considered a single tort in the District of Columbia … [W]here a plaintiff alleges claims for both strict liability and breach of implied warranties based on allegedly defective products …, the implied warranty claims must be dismissed"); *Liberty Mut. Ins. Co. v. Equip. Corp. of Am.*, 646 F. Supp. 2d 51, 55-56 (D.D.C. 2009) (similar); *Dyson v. Winfield*, 113 F. Supp. 2d 35, 42 (D.D.C. 2000) (similar).

34

In any event, like their express warranty claims, Plaintiffs' implied warranty claims must also be dismissed for failure to plead that the pre-suit notice requirement was satisfied. *See* N.J. Stat. Ann. § 12A:2-607(3)(a); D.C. Code § 28:2-607(3).

### J.        Unjust Enrichment

Finally, Plaintiffs allege that J&J was unjustly enriched at their expense. "Unjust enrichment is a common law equitable claim, available only where there is no adequate remedy at law." *Pernice v. Bovim*, 2015 U.S. Dist. LEXIS 112919, at *19 (D.D.C. Aug. 26, 2015). "Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). The plaintiff must "show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994) (citations omitted).

Here, Plaintiffs fail to plead beyond the conclusory level that they conferred any benefit on J&J. To the extent they were prescribed brand-name Levaquin (which, once again, the Complaint is not at all clear about), Plaintiffs do not plead any concrete facts to show that *they* paid for Levaquin out of their own pockets, rather than relying on an insurer, as most patients do. Nor do Plaintiffs plead that they paid money *to J&J* in exchange for Levaquin, as opposed to a third party several steps removed in the stream of commerce. This is crucial, because a claim for unjust enrichment "requires privity between the parties." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 460 (D.N.J. 2012); *see Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 358 (D.D.C. 2015) (finding "no authority demonstrating that benefits received from third-parties can be the proper subject of an unjust enrichment claim"). "When

35

consumers purchase a product from a third party, they confer a benefit on that third party, not on the manufacturer." *Snyder*, 792 F. Supp. 2d at 724.[27]

In addition, for all the reasons discussed above, the complaint does not plead facts that establish beyond the speculative level that J&J's retention of any money it theoretically may have received from Plaintiffs would be "unjust." If Plaintiffs fail to plausibly plead that Levaquin was defective under any recognized product liability theory, or that Levaquin caused their alleged injuries, then there can be no injustice as a matter of law. *See Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim … will stand or fall with the related claim."); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912, 937 (3d Cir. 1999) ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims…."); *Zafarana v. Pfizer Inc.*, 724 F. Supp. 2d 545, 560 (E.D. Pa. 2010) ("[U]njust enrichment is not a substitute for failed tort claims.").

## VI.   PLAINTIFF FRATTI'S CLAIMS ARE TIME-BARRED.

It is overwhelmingly likely that *all* of the Plaintiffs' claims are time-barred. The complaint itself appears to acknowledge that Plaintiffs' injuries were manifest by "May 2009." (Compl. ¶ 96.) And, as noted above, practically all of the levofloxacin sold since 2011 was generic and not manufactured by J&J, so if Plaintiffs *were* injured by J&J's name-brand Levaquin, it was almost certainly outside the limitations window. However, J&J acknowledges that dismissal on statute-of-limitations grounds at the pleadings stage is rare, since many claims employ

---

[27] Even in states that do not require strict privity, an unjust enrichment claim will fail if the nexus between the parties is "too attenuated." *See* Renaissance Defendants' Br., Part III.

some version of the "discovery rule."  Accordingly, at this juncture, J&J does not seek dismissal of the claims of Plaintiffs Aston, Martin, Melvin, and Schulkin on timeliness grounds.

Plaintiff Fratti, however, presents an exceptional case.  In April 2009—well over six years ago—he filed another lawsuit against J&J concerning Levaquin.[28]  In that complaint, Mr. Fratti alleged that "[h]is physicians ha[d] diagnosed him with organic brain damage, peripheral neuropathy, and severe tendon injuries *all due to Levaquin toxicity*."[29]  Mr. Fratti accused J&J of "deliberately" making "affirmative misrepresentation[s]" and "conceal[ing] … material facts relating to the defective nature and risks of Levaquin."[30]  Mr. Fratti ultimately dismissed that lawsuit without prejudice.[31]

Thus, without question, Mr. Fratti had not only *suffered* an alleged injury due to Levaquin over six years ago, but had *discovered* that alleged injury.  That is well outside the four-year statute of limitations under RICO, which begins to run "when [the] plaintiff knew or should have known of his injury."  *Rotella v. Wood*, 528 U.S. 549, 553 (2000).  Knowledge of injury is the key; awareness of "the other elements of [a RICO] claim," such as the "pattern of racketeering activity," is irrelevant to accrual.  *Id.* at 555-59.  It is also well outside the statute of limitations for any of the common-law claims asserted here.  *See* N.J. Stat. 2A:14-2(a) (2 years for personal injury actions under New Jersey law); N.J. Stat. § 12A:2-725 (4 years for breach of warranty under New Jersey law); D.C. Code § 12-301(8) (3 years for personal injury actions under D.C. law); D.C. Code § 28:2-725 (4 years for breach of warranty under D.C. law).

---

[28] *See* Compl. (Dkt. 1), *Fratti v. Johnson & Johnson*, No. 0:09-cv-00812-JRT (D. Minn. Apr. 8, 2009) (Knobler Decl., Ex. 15).  The Court may take judicial notice of Mr. Fratti's complaint, since it is a "public document[] filed on a court docket."  *Lewis v. Parker*, 67 F. Supp. 3d 189, 195 n.6 (D.D.C. 2014).

[29] *Id.* ¶ 106 (emphasis added).

[30] *Id.* ¶¶ 139-55.

[31] *See* Stip. of Dismissal Without Prejudice (Dkt. 17), *Fratti v. Johnson & Johnson*.

Mr. Fratti and his fellow Plaintiffs preemptively argue that "the running of any statute of limitations has been tolled" because J&J engaged in unspecified "fraudulent concealment." (Compl. ¶ 115.)  But "allegations of fraudulent concealment … must meet the requirements of Fed. R. Civ. P. 9(b)," *Harris v. Koenig*, 602 F. Supp. 2d 39, 53 (D.D.C. 2009), and here, the allegations of fraudulent concealment are entirely conclusory.  (*See* Compl. ¶¶ 114-19.)

Moreover, "fraudulent concealment" cannot possibly provide any ground for tolling after the date Mr. Fratti was supposedly told by his physicians that "Levaquin toxicity" had caused his injuries—*let alone* after the date in 2009 when Mr. Fratti filed suit against J&J alleging that its intentional wrongdoing in connection with Levaquin had caused him injury.  *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 385 (7th Cir. 2010) ("But if the obstructive behavior occurs *after* the plaintiff's inquiry has reached the point at which he has discovered … that he has a claim upon which to found a suit, the defendant's obstructionism has no causal significance, and so is not a ground for an estoppel.").

## CONCLUSION

For the reasons described above, the complaint should be dismissed with prejudice.

Respectfully submitted,

March 21, 2016

  /s/ Michael M. Maya
Ethan M. Posner (D.C. Bar No. 427970)
Michael M. Maya (D.C. Bar No. 991742)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000 / Fax: (202) 662-6291
Email: eposner@cov.com; mmaya@cov.com

William F. Cavanaugh, Jr. (*pro hac vice* pending)
Jonah M. Knobler (*pro hac vice* pending)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 336-2000 / Fax: (212) 336-2222

*Attorneys for Defendants Johnson & Johnson,*
*Janssen Research & Development, LLC, and*
*Janssen Pharmaceuticals, Inc.*

39