**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TERRY ASTON, JOHN FRATTI, LINDA MARTIN, DAVID MELVIN, and JENNIFER WILCOX,<br><br>           Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., RENAISSANCE TECHNOLOGIES, L.L.C., PETER F. BROWN, ROBERT L. MERCER, JAMES H. SIMONS, and DR. MARGARET A. HAMBURG,<br><br>           Defendants. | Case No. 1:16-cv-00086-RJL<br><br>The Honorable Richard J. Leon |

<u>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITITION TO DEFENDANT DR. MARGARET A. HAMBURG'S MEMORANDUM OF LAW IN SUPPORT OF DR. MARGARET A. HAMBURG'S MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

Larry Klayman_____
**Larry Klayman, Esq**.
The Klayman Law Firm
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Attorney for all Plaintiffs*

Dated: June 13, 2016

## TABLE OF CONTENTS

INTRODUCTION AND PRELIMINARY STATEMENT ......................................1

I.      THE LAW AND ANALYSIS..........................................................................3

        A.      Standard of Review .....................................................................3

        B.      Plaintiffs' Have Sufficiently Pled RICO Claims Because They Pled That
                Defendants Engaged in a Pattern of Racketeering Activity Related to Their
                Enterprise ..........................................................................5

                1.      Plaintiffs Sufficiently Pled RICO Enterprise..............................7

                2.      Plaintiffs Sufficiently Pled RICO Pattern ................................10

                3.      Plaintiffs Sufficiently Pled RICO Injury to Business or Property .........12

        C.      Defendant Hamburg Is Not Entitled to Qualified Immunity Because When
                She Violated Plaintiffs' Rights, She Acted Outside Her Discretion as FDA
                Commissioner ......................................................................15

        D.      In the Unlikely Event This Court Concludes that Defendant Hamburg Acted
                Within Her Discretion As FDA Commissioner When She Violated Plaintiffs'
                Rights, Defendant Hamburg Is Still Not Entitled to Qualified Immunity
                Because Plaintiffs' Stated Valid Claims That Defendant Hamburg Violated
                and Those Violated Rights Were Clearly Established ...................................20

                1.      Plaintiffs' Allegations Are Sufficient to Overcome Any Alleged Qualified
                        Immunity Because Plaintiffs' Have Stated Valid Claims for Defendant
                        Hamburg's Various Violations..............................................22

                2.      Plaintiffs' Allegations Are Sufficient to Show that Defendant Hamburg
                        Violated Plaintiffs' Clearly Established Rights .........................25

                        a.      Plaintiffs' Rights Were Clearly Established When Defendant
                                Hamburg Violated Them ..........................................25

                        b.      A Reasonable Official in Defendant Hamburg's Position Would
                                Have Understood that His or Her Misconduct Violated That
                                Right................................................................27

                3.      Plaintiffs' Sufficient Failure to Warn Allegations ....................28

                4.      Plaintiffs' Sufficient Conflict of Interest Allegations...............33

    **5.**  ***Plaintiffs' Sufficient Campaign Contributions Allegations*** ...................39

  **E.**  **The Issue of Defendant Hamburg's Alleged Qualified Immunity Must
    Ultimately Be Determined After Discovery** .......................................................41

**II.**  **CONCLUSION** ...........................................................................................................43

# TABLE OF AUTHORITIES

## Cases

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*,
    483 U.S. 143 (1987) ..................................................................22

*Ammons v. State Dep't of Soc. & Health Servs.*,
    648 F.3d 1020 (9th Cir. 2011) ...................................................32

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ...............................................25, 28, 41, 42

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ....................................................................8

*Arnold v. United States*,
    816 F.2d 1306 (9th Cir. 1987) ...................................................16

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) .............................................................21, 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................4, 5, 22, 31

*Barnhardt v. District of Columbia*,
    560 F. Supp. 2d 15 (D.D.C. 2008) ........................................31, 32

*BCS Services, Inc. v. BG Investments, Inc.*,
    728 F.3d 633, 638 (7th Cir. 2013) .............................................13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................3, 4

*Boyle v. United States*,
    556 U.S. 938 (2009) .........................................................7, 8, 9, 10

*Brown v. Crawford*,
    906 F.2d 667 (11th Cir. 1990) ...................................................32

*Butz v. Economou*,
    438, U.S. 478 (1977) ..............................................................2, 15

*Carr v. Brown*,
    395 A.2d 79 (D.C. 1978) ...........................................................13

*Connick v. Thompson,*
    131 S. Ct. 1350 (2011) ................................................................................31

*Crawford v. Britton,*
    523 U.S. 574 (1998) .....................................................................24, 41, 42

*Diaz v. Gates,*
    420 F.3d 897 (9th Cir. 1979) ...............................................................12, 13

*Dunlop v. Munroe,*
    7 Cranch 242 (1812) ....................................................................................31

*Erickson v. Pardus,*
    551 U.S. 89 (2007) ........................................................................................3

*Espinosa v. City & County of San Francisco,*
    598 F.3d 528 (9th Cir. 2010) ......................................................................27

*First Am. Corp. v. Al-Nahyan,*
    17 F. Supp. 2d 10 (D.D.C. 1998)..................................................................6

*Guerrero v. Moore,*
    442 Fed. Appx. 57, 58 (4th Cir. Va. 2011) ............................................26, 27

*H.J. Inc. v. Northwestern Bell Telephone Co.,*
    492 U.S. 229 (1989) ....................................................................................22

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) .........................................................................21, 25, 42

*Holmes v. Sec. Investor Prot. Corp.,*
    503 U.S. 258 (1992) ....................................................................................22

*Holloman v. Harland,*
    370 F.3d 1252 (11th Cir. 2004) ........................................................17, 18, 19

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ...............................................................................26, 28

*Kartesva v. Dep't of State,*
    37 F.3d 1524 (D.C. Cir. 1995) ...............................................................40, 41

*Kenley v. District of Columbia,*
    83 F. Supp. 3d 20 (D.D.C. 2015) ................................................................31

*Lassiter v. Alabama A. & M. Univ.,*

        28 F.3d 1146 (11th Cir. 1994) ...................................................................26

*Loumiet v. United States*,
        968 F. Supp. 2d 142 (D.D.C. 2013) ......................................................20

*Lujan v. Defenders of Wildlife*,
        504 U.S. 555 (1992) ...............................................................................12

*Lum v. Bank of Am.*,
        361 F.3d 217 (3d Cir. 2004) ....................................................................4

*Matrixx Initiatives, Inc. v. Siracusano*,
        131 S. Ct. 1309 (2011) .............................................................................4

*McKinney v. Whitfield*,
        736 F.2d 766 (D.C. Cir. 1984) .........................................................16, 17

*McLaurin v. Fischer*,
        768 F.2d 98 (6th Cir.  1985) ...................................................................13

*Mendoza v. Zirkle Fruit Co.*,
        301 F.3d 1163 (9th Cir. 2002) ...........................................................12, 13

*Merrit v. Mackey*,
        827 F.2d 1368 (9th Cir. 1987) .................................................................13

*Mitchell v. Forsyth*,
        472 U.S. 511, 513-15, (1985) ..................................................................41

*Morrison v. Syntex Labs., Inc.*,
        101 F.R.D. 743 (D.D.C. 1984) ..................................................................5

*Moss v. U.S. Secret Serv.*,
        711 F.3d 941 (9th Cir. 2013) ...................................................................23

*Mountain States Legal Foundation v. Bush*,
        306 F.3d 1132 (D.C. Cir. 2002) ................................................................3

*Nat'l Org. of Women v. Scheidler*,
        510 U.S. 249 (1994) ................................................................................12

*Paulin v. The George Washington School of Medicine and Health Sciences*,
        878 F. Supp. 2d 241 (D.D.C. 2012) ..........................................................4

*Pearson v. Callahan*,
        555 U.S. 223 (2009) ..........................................................................21, 27

*Pereira v. United States,*
    347 U.S. 1 (1954) ....................................................................................................11

*Poindexter v. Wachovia Mortgage Corp.,*
    F. Supp. 2d, 2012 WL 1071248 (D.D.C. 2012) ..................................................4

*Robertson v. Sichel,*
    127 U.S. 515 (1888) ..............................................................................................32

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.,*
    84 F.3d 629 (2d Cir. 1996) ....................................................................................11

*Saucier v. Katz,*
    533 U.S. 194 (2001) ......................................................................................21, 25, 27

*Schmuck v. United States,*
    489 U.S. 705 (1989) ..............................................................................................11

*Sedima v. Imrex Co.,*
    473 U.S. 479 (1985) ................................................................................................6

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,*
    742 F.2d 786 (3d Cir. 1984) ..................................................................................5

*Singh v. District of Columbia,*
    55 F. Supp. 3d 55 (D.D.C. 2014) ........................................................................31

*Stewart v. Nat'l Educ. Ass'n,*
    471 F.3d 169 (D.C. Cir. 2006) ..............................................................................3

*Taylor v. FDIC,*
    132 F.3d 753 (D.C. Cir. 1997) ............................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ................................................................................................5

*Thomas v. Shinseki,*
    657 F. Supp. 2d 74 (2009) ..............................................................................21, 22

*United States v. Gaubert,*
    499 U.S. 315 (1991) ..............................................................................................20

*United States v. Lee,*
    106 U.S. 196 (1882) ................................................................................................2

*United States v. Philip Morris USA., Inc*,
    449 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................6

*United States v. Turkette*,
    452 U.S. 576 (1981) ........................................................................................7

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993)...............................................................................5

*Willson v. Cagle*,
    711 F. Supp. 1521 (N.D. Cal 1988) ........................................................16, 17

*Wilson v. Layne*,
    526 U.S. 603 (1999) ......................................................................................27

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................2, 3, 25, 43

**Statutes and Codes**

18 U.S.C. § 201 .....................................................................................................10

18 U.S.C. § 208.................................................................................33, 34, 36, 37, 39

18 U.S.C. § 1341 ...................................................................................................10

18 U.S.C. § 1343 ...................................................................................................10

18 U.S.C. § 2314 ...................................................................................................10

18 U.S.C. § 2315 ...................................................................................................10

18 U.S.C. § 1956(a)(2) ..........................................................................................10

18 U.S.C. §§ 1961-1968 .........................................................................................2

18 U.S.C. § 1961(1)(B) ..........................................................................................10

18 U.S.C. § 1961(5) ...............................................................................................10

18 U.S.C. § 1961(1)-(5) .........................................................................................10

18 U.S.C. § 1962(a) ...............................................................................................22

18 U.S.C. § 1962(b) ..................................................................................................22

18 U.S.C. § 1962(c) ..................................................................................................22

18 U.S.C. § 1962(d) ..................................................................................................22

18 U.S.C. § 1964(4) ....................................................................................................7

18 U.S.C. § 1964(c) ..................................................................................................12

A.R.S. § 13-2314.04(A) ........................................................................................2, 15

Ala. Code § 16-6B-2(h) ......................................................................................18, 19

Ala. Code § 16-43-5 ..................................................................................................18

Pub. L. No. 91-452-§ 904(a), 84 Stat. 947 (1970) ....................................................6

## Other Authorities

7 Jerold S. Solovy & R. Douglas Rees, Bus. & Corn. Litig. Fed. Cts. § 80:18 (2d ed. 2009) .......7

Gregory C. Sisk, Litigation With the Federal Government (ALI-ABA, 4th ed. 2006) ................21

Plaintiffs Terry Aston, John Fratti, Linda Martin, David Melvin, and Jennifer Wilcox, (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant Dr. Margaret A. Hamburg's ("Defendant Hamburg") motion to dismiss the Amended Complaint. This opposition joins in and incorporates by reference the oppositions for both Defendants Johnson & Johnson and Renaissance Technologies, L.L.C.

## INTRODUCTION AND PRELIMINARY STATEMENT

Defendant Hamburg devotes almost all of her attention on attempting to convince this Court that she is entitled to qualified immunity because of Plaintiffs' alleged deficiencies in their Amended Complaint, not because her intentional misconduct was within the scope of her discretion as the Commissioner of the U.S. Food & Drug Administration ("FDA"), or because she did not violate clearly established statutory law. Contrary to Defendant Hamburg's false recitations of the Amended Complaint, Plaintiffs specifically allege that Defendant Hamburg, acting outside the scope of her discretion as a federal employee, reaped large financial benefits by suppressing information to Plaintiffs, physicians, and the American citizenry the truth about the life-threatening and deadly effects of a drug named Levaquin, manufactured by Defendant Johnson & Johnson, by virtue of her husband's hedge fund, Renaissance Technologies, L.L.C. ("Renaissance") – a hedge fund which her husband, Defendant Peter Brown, personally profited enormously from – which held as much as half a billion dollars in value of Defendant Johnson & Johnson stock.

Now, Defendant Hamburg, through her counsel, who not coincidentally is legal counsel for several of Mrs. Hillary Clinton's top aides, many of whom are deeply engulfed in a legal battle regarding Mrs. Clinton's misuse of a private email server, has moved to dismiss Plaintiffs' claims against her. But, Defendant Hamburg fails to justify the dismissal of any of Plaintiffs'

claims. Indeed, Defendant Hamburg fails the very first requirement on a motion to dismiss, which is to accept the allegations of the complaint as true and draw all reasonable inferences in Plaintiffs' favor. Instead, Defendant Hamburg seems intent on fallaciously dissecting the counts against her, and tries to deal with certain elements separately from the whole of which they are a part. This leads her into a factual confusion, and at the end of the day, she fails to justify the dismissal on a Federal Rule of Civil Procedure ("FRCP") 12(b)(6) motion to dismiss of either the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") statute, 18 U.S.C. §§1961-1968, or the Arizona State RICO statute, A.R.S. § 13-2314.04(A). Defendant Hamburg asks this Court to conclude that her very employment with the FDA means that – no matter the magnitude of her transgressions – she cannot be made to answer for her actions and inactions. The import of this position is breathtaking. It collides head on with the founding principles of this country.

> Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law. 'No man [or woman] in this country is so high that he [or she] is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.'

*Butz v. Economou*, 438 U.S. 478, 506 (1978) (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)).

The U.S. Supreme Court does not agree that Defendant Hamburg is above the law and that Plaintiffs' are without a remedy for the numerous statutory provisions of which Defendant Hamburg's scheme ran afoul. By way of her carefully choreographed but highly flawed motion to dismiss, the position of Defendant Hamburg – and generally some government officials alike – is that she cannot be held liable for damages and that she is, in effect, *above the law*; but this would deprive Plaintiffs the remedy recognized by the U.S. Supreme Court in an assortment of

cases.  Only by holding government officials like Defendant Hamburg accountable, sued in his

or her personal capacity, will effectively ensure that citizens will not continue to be an

afterthought in an ongoing and continuous cover-up and elaborate scheme in suppressing

information, evaluating drug warnings, drug safety, and the deadly effects of a drug that put

hundreds of millions, if not billions of dollars in the pockets of each and every Defendant. A

close review of Defendant Hamburg's arguments reveals that she has failed to demonstrate that

any of the claims is not adequately pled and accordingly, her non-meritorious FRCP 12(b)(6)

motion to dismiss must be denied as a matter of law. Only by denying Defendant Hamburg's

motion to dismiss can this Court ensure that Plaintiffs and the American citizenry are never again

subjected to such blatant and intentional disregard and willful suppression of information

concerning the health and safety of those who Defendant Hamburg had been entrusted to protect.

## I.    THE LAW AND ANALYSIS

### A.    Standard of Review

This Court must deny Defendant Hamburg's motion to dismiss unless "it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief." *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002). To

determine the legal sufficiency of Plaintiffs' Amended Complaint, this Court "must accept as

true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89,

94 (2007). A court may not dismiss a complaint merely because it appears unlikely that the

plaintiff can prove those facts or will ultimately prevail on the merits. *See Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007). Rule 12(b)(6) also requires "construing the complaint

liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the

facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).

A motion to dismiss must be denied where, as here, allegations of the complaint contain sufficient facts which, if true, "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In turn, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The standard is **plausibility**, not probability. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556);[1] *see Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 n.12 & 1323 (2011). In considering the factual allegations, a Court must view the complaint as a whole, assume the truth of its allegations, and afford the plaintiff the benefit of reasonable inferences from the allegations. *Matrixx*, 131 S. Ct. at 1322, 1323; *see also Poindexter v. Wachovia Mortgage Corp.*, F. Supp. 2d, 2012 WL 1071248, *1 (D.D.C. 2012) (Wilkins, J.) ("the court liberally construes the complaint in favor of the non-moving party and grants all reasonable inferences to the nonmovant that can be derived from the facts alleged.").

Indeed, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity." *Iqbal*, 556 U.S. at 664. As this Court stated in *Paulin v. The George Washington School of Medicine and Health Sciences*, "[i]t is essential to remember that, for the purposes of ruling on a motion to dismiss, the factual allegations of the complaint *must* be presumed to be true and liberally construed in favor of the Plaintiff." *Paulin v. The George Washington School of Medicine and Health Sciences*, 878 F. Supp. 2d 241, 246 (D.D.C. 2012) (emphasis in original). In deciding motions to dismiss, courts may consider exhibits, matters of public record, and other documents that form the basis of a claim. *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3

---

[1]     Plaintiffs are confident that ultimately the evidence will demonstrate that all of their claims are more than probable. At this early pleading stage, however, it is not even necessary to demonstrate probability, only *plausibility*.

(3d Cir. 2004); *see also Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (affirming the district

court's consideration of certain facts set out in public documents plaintiffs attached to their

opposition to a motion to dismiss and treating those documents as part of the pleadings); *see,*

*e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). *See* Affidavit of Larry

Klayman (Exhibit 18). The findings and conclusions in the Amended Complaint must be

accepted as true – not utterly disregarded as Defendant Hamburg seeks to have this Court do.

Under these high standards, Defendant Hamburg's motion to dismiss must be denied as a matter

of law.

      **B.**      **Plaintiffs' Have Sufficiently Pled RICO Claims Because They Pled**
                  **Defendants Engaged in a Pattern of Racketeering Activity Related to Their**
                  **Enterprise.**

      Federal Rule of Civil Procedure 9(b), which governs Plaintiffs' allegations of fraud as

racketeering activity, "requires plaintiffs to plead with particularly the 'circumstances' of the

alleged fraud." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786,

791 (3d Cir. 1984). While "allegations of 'date, place or 'time'" are sufficient, "nothing in the

rule requires them. Plaintiffs are free to use alternative means of injecting precision and some

measure of substantiation into their allegations of fraud." *Id.* Indeed, *Iqbal*, a case that Defendant

Hamburg relies on, must ultimately be understood in light of the unique factual context in which

the case arose. It does not, as Defendant Hamburg would have it, broadly permit officials like

herself to act in a reckless disregard for individuals' rights in a manner at odds with decades of

established constitutional tradition.

      Defendant Hamburg misleads this Court by citing a case which allegedly stands for the

proposition that "RICO should not be used by private plaintiffs to claim treble damages for

*ordinary* and *routine* tort causes of action." *Morrison v. Syntex Labs., Inc.*, 101 F.R.D. 743, 745

(D.D.C. 1984) (emphasis added). Nothing could be further from the truth. Plaintiffs do not allege *ordinary* or *routine* tort causes of action; rather, Plaintiffs sufficiently allege that Defendant Hamburg, by and through her husband's multi-billion dollar hedge fund, Defendant Renaissance, fraudulently used the mail and wires, and other illegal predicate acts, to commit overt acts in furtherance of a racketeering enterprise and conspiracy to reap financial benefits by failing to fully disclose to the Plaintiffs, physicians, and the public – despite being fully aware of the highly dangerous nature – Levaquin's life-threatening and deadly nature. These allegations in Plaintiffs' Amended Complaint are anything but *ordinary and routine* and indeed not only Plaintiffs have been injured, but over 5,000 persons are not dead as a result of ingesting Levaquin.

Both the accusation and the argument that the allegations are ordinary and routine lack merit, contradict the U.S. Supreme Court's ruling in *Sedima v. Imrex Co.*, 473 U.S. 479 (1985) (RICO is to be read broadly, and should be liberally construed to effectuate its remedial purpose in granting the private right of action.), and fly in the face of Congress's intent: RICO must be "liberally construed to effectuate its remedial purpose." Pub. L. No. 91-452-§ 904(a), 84 Stat. 947 (1970). Plaintiffs more than sufficiently allege an enterprise, a pattern, and that Defendant Hamburg's violations of RICO were a proximate cause of Plaintiffs' injuries to their business or property. In addition, "with respect to RICO, Congress intended there to be aiding and abetting liability in civil actions." *Cf. First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 23-24 (D.D.C. 1998). As *United States v. Philip Morris USA., Inc*. puts it: "Defendants have marketed and sold their lethal product with zeal, with deception, with single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." *United States v. Philip Morris USA., Inc*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006).

6

### 1.   *Plaintiffs Sufficiently Pled RICO Enterprise*

The RICO statute broadly defines an enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1964(4). *United States v. Turkette* provides guidance on the enterprise issue and describes an association as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 581 (1981). Such an enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id*. at 583. The U.S. Court of Appeals for the District of Columbia Circuit held that an enterprise did not require any particular organizational structure. 7 Jerold S. Solovy & R. Douglas Rees, Bus. & Corn. Litig. Fed. Cts. § 80:18 (2d ed. 2009).

In *Boyle v. United States*, a case that Defendant Hamburg relies on, the U.S. Supreme Court sought to clarify the organizational structure component of an enterprise and, without overturning *Turkette*, the Court held that an enterprise is simply "a continuing unit that functions with a common purpose*." Boyle v. United States*, 556 U.S. 938, 939 (2009). Contrary to Defendant Hamburg's motion to dismiss, the Court rejected the notion that a RICO plaintiff must *prove* the existence of an enterprise. The Court also rejected that a RICO enterprise requires a hierarchy, a chain of command, fixed roles, regular meetings, or rules and regulations. *Id*. Instead, the Court ruled that an enterprise needs only three structural features: (1) "a purpose," (2) "relations among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprises purpose." *Id*. at 956. Plaintiffs sufficiently allege all three.

First, Plaintiffs' Amended Complaint discusses at length Defendants' purpose to market,

lobby, promote, promote for off-label use, distribute and sell, through interstate commerce and a pattern of racketeering, a profitable but highly dangerous drug made by Defendant Johnson & Johnson, a company that reaped each and every one of the Defendants millions, if not billions of dollars. Am. Compl. at ¶ 93 (Exhibit 1). "[T]he purpose of Defendants' racketeering enterprise included, but was not limited to, reaping large financial gain by willfully and intentionally suppressing material information, through the fraudulent use of the U.S. mails and wires, about the devastating, life threatening, and deadly effects of Levaquin." *Id*. at ¶¶ 101, 107, 119, 133, 145, 174, 248 ("[Defendants] made the[se] representations with the intent or purpose of deceiving Plaintiffs, Plaintiffs' physicians, Plaintiffs' healthcare providers, and the healthcare industry." Thus, Plaintiffs allege unequivocally " a purpose." *Boyle*, 556 U.S. at 956.

Second, when discussing the Defendants' criminal enterprise, and indeed throughout the entire Amended Complaint, Plaintiffs' allege in detail the relationship that each and every Defendant had with each other and that each and every one of them "maintained an ongoing relationship during the course of their ongoing criminal enterprise." Am. Compl. at ¶ 101. Specifically, Plaintiffs' allege:

> Defendant Hamburg was and remains married to Defendant Brown, who served in an executive capacity at Defendant Renaissance Technologies, for which Defendants Mercer and Simons also served in an executive capacity. Renaissance Technologies held and continue[s] to hold substantial stock in Defendant Johnson & Johnson. Defendant Johnson & Johnson, on information and belief, provided Defendant Hamburg with significant gratuities during Defendant Hamburg's tenure as FDA Commissioner.

*Id*. Not surprisingly, Defendant Johnson & Johnson has a long history of engaging in racketeering and bribery and has been made to pay by the U.S. government for its crimes. In 2011, Defendant Johnson & Johnson agreed to pay $70 million to settle criminal charges of bribing doctors in Europe and paying kickbacks to the Iraqi government to illegally obtain

business. The U.S. Securities and Exchange Commission found that Defendant Johnson &

Johnson used fake contracts and sham companies to deliver the bribes. Defendant Johnson &

Johnson also allegedly paid kickbacks to the Iraqi government to obtain contracts under the

United Nations Oil for Food Program. Am. Compl. at ¶ 39;

http://usatoday30.usatoday.com/money/industries/health/2011-04-08-johnson-and-johnson-

settles.htm# (Exhibit 2); http://www.cbsnews.com/news/internal-emails-jj-knew-of-bribery-

black-hole-for-years/ (Exhibit 3).

Then, in 2013, in one of the largest health care fraud settlements in U.S. history,

Defendant Johnson & Johnson paid $2.2 billion to end civil and criminal investigations into

kickbacks to pharmacists and the marketing of pharmaceuticals for off-label uses. The settlement

covered the marketing of the anti-psychotic drugs Risperdal and Invega and a heart-related drug

called Natrecor. http://www.reuters.com/article/us-jnj-settlement-idUSBRE9A30MM20131104

(Exhibit 4); https://www.justice.gov/opa/pr/johnson-johnson-pay-more-22-billion-resolve-

criminal-and-civil-investigations (Exhibit 5). Defendant Johnson & Johnson just recently was

ordered by a jury to pay a family $72 million for willfully trying to cover up and influence

boards that regulate cosmetics regarding the dangerous, cancerous effects of a particular type of

talcum powder. Am. Compl. at ¶ 4; http://money.cnn.com/2016/05/03/news/companies/johnson-

and-johnson-cancer-talcum-powder/index.html (Exhibit 6). The breadth of Defendant Johnson &

Johnson's criminal behavior is inexhaustible. Plaintiffs will prove this through discovery and this

pattern and practice of illegality raises a strong evidentiary inference that the same RICO

conduct occurred here. Still, Plaintiffs' Amended Complaint clearly and indisputably alleges

"relations among those associated with the enterprise." *Boyle*, 556 U.S. at 956.

Third, Plaintiffs allege that the federal government from 2009 to 2015 employed

Defendant Hamburg and during that time, her husband Defendant Brown worked as either an executive or co-CEO of a multi-billion dollar hedge fund, Defendant Renaissance, which, both the hedge fund and the individuals involved, including Defendant Brown, reaped huge financial benefits from Defendant Renaissance, holding stock in Defendant Johnson & Johnson, the manufacturer of Levaquin. Continuity is a theme that runs throughout Plaintiffs' Amended Complaint. As such, Plaintiffs sufficiently pled "longevity sufficient to permit these associates to pursue the enterprises purpose." *Boyle*, 556 U.S. at 956; Am. Compl. at ¶¶ 101, 107, 130, 133, 134, 156, 158.

### 2. *Plaintiffs Sufficiently Pled RICO Pattern*

Under RICO's plain, statutory language, a plaintiff satisfies the "pattern" element of RICO if the defendant "committed at least two acts of racketeering activity" within 10 years of one another. 18 U.S.C. § 1961(5). Plaintiffs not only allege two acts of racketeering activity, but several of them. The Plaintiffs allege that Defendant Hamburg, and the other Defendants, engaged in a pattern of racketeering activity by knowingly, willfully and unlawfully conducting and participating in the affairs of the enterprise within the meaning of 18 U.S.C. § 1961(1)-(5). Am. Compl. at ¶ 104. In support of their RICO claims, the Plaintiffs allege that Defendant Hamburg committed predicate acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and committed bribery in violation of 18 U.S.C. § 201, money laundering in violation of 18 U.S.C. § 1956(a)(2) and transporting and receiving money in violation of 18 U.S.C. §§ 2314 and 2315. Mail and wire fraud are forms of racketeering activity for purposes of RICO. 18 U.S.C. § 1961(1)(B); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454 (2006).

To successfully make a claim of mail or wire fraud as a predicate act, a plaintiff need only allege (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional

participation of the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme. *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). It is not necessary for a plaintiff to show that the defendants actually mailed or wired anything themselves. *Pereira v. United States*, 347 U.S. 1, 8 (1954). It is also unnecessary that the mail or wire communications themselves contain fraudulent commissions. *Schmuck v. United States*, 489 U.S. 705, 711 (1989). Moreover, it is unnecessary for a plaintiff to even allege that each individual defendant personally committed at least two of the predicate acts of mail or wire fraud. It is sufficient that a plaintiff alleges that the individuals committed the predicate acts of mail and wire fraud by directing others to use the mails or wires to further the fraudulent scheme. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he [or she] 'causes' the mails to be used." *Pereira*, 347 U.S. at 8-9.

Because Plaintiffs allege that Defendant Hamburg's pattern and practice of illegally acting outside the scope of her authority as FDA Commissioner in furtherance of her racketeering enterprise and conspiracy, she suppressed and trashed repeated requests by physicians, legislators, and patients to add the appropriate safety warnings to highly dangerous drugs, including Levaquin. *See* Exhibits 7, 8, 9, 10. As a result, her husband Defendant Brown, by and through his hedge fund Renaissance, shared in profits made from Defendant Johnson & Johnson stock, thereby increasing the financial worth of Defendant Hamburg and Brown. By the nature of their relationship with Defendant Hamburg and her position at the FDA, Defendant Renaissance and Defendant Johnson & Johnson, and one of the largest health care giants in the world, each and every one of them, jointly and severally, orchestrated, supervised, monitored, and oversaw operations of the alleged scheme, the Plaintiffs' allegations against all of the

11

Defendants, including Defendant Hamburg, are sufficient to allege a pattern of racketeering activity for the purposes of RICO. Am. Compl. at ¶ 57. Defendant Hamburg fraudulently used the U.S. mails and wires to commit overt acts in furtherance of her racketeering enterprise and conspiracy by willfully, intentionally, illegally, and continually ignoring the on-going requests to issue additional safety warnings about the devastating and life threatening effects of Levaquin. *Id*. at ¶ 60; *see also id*. at ¶¶ 93, 96(c), 101, 104, 108, 133, 136, 137, 144, 149, 150, 173, 174, 175.

### 3.   *Plaintiffs Sufficiently Pled RICO Injury to Business or Property*

In the context of RICO, "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. of Women v. Scheidler*, 510 U.S. 249, 256 (1994) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

In *Diaz v. Gates*, plaintiff sued defendants, police officers and others, under RICO, for allegedly fabricating evidence against him to obtain a false conviction. He lost employment, employment opportunities, wages, and other compensation because he was unable to pursue gainful employment while defending himself against unjust charges and while unjustly incarcerated. *Diaz v. Gates*, 420 F.3d 897, 898 (9th Cir. 1979). The court distinguished the mere loss of something of value (such as wages) from injury to a property interest (such as the right to earn wages). *Id*. at 900 n.1. Although lost wages in and of themselves are not compensable under RICO, the latter form of economic injury – that is, the right to earn wages – was actionable under section 1964(c). *Id*. at 904; *see also Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163, 1168 n.4 (9th Cir. 2002) (holding that where a class of agricultural laborers alleged that their employers had

depressed their wages by illegally hiring undocumented workers at below-market wages, the workers sufficiently alleged an injury to a property interest, "the legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes").

Indeed, " . . . business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, are considered to be property . . ." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978); *see also BCS Services, Inc. v. BG Investments, Inc.*, 728 F.3d 633, 638 (7th Cir. 2013) (The mail and wire fraud statutes prohibit schemes to defraud for the purpose of obtaining money or property. For the purposes of standing under section 1962(c), however, the money or property obtained by the defendant need not be the plaintiff's money or property, provided the plaintiff is directly injured by the defendants' unlawful scheme.). Moreover, several landmark cases have held that the loss of employment is considered a property interest. *See McLaurin v. Fischer*, 768 F.2d 98, 102-03 (6th Cir. 1985) (ruling that a reasonable jury could find that the plaintiff had a property interest in his continued employment as the head of the Division of Neurosurgery of a university hospital where there was a mutual understanding between the plaintiff and his employer that his employment was permanent unless he became physically unable to perform his job or he resigned); *see also Merrit v. Mackey*, 827 F.2d 1368, 1370 (9th Cir. 1987) (holding that a plaintiff had a property interest in continued employment).

Here, Plaintiffs sufficiently allege that each and every one of them is unable to maintain and perform for future earnings, which is the right to earn wages. Am. Compl. at ¶¶ 80, 81, 82, 83, 84, 85, 151, 159, 170, 176, 184. ("As a direct and proximate result of each and every Defendants' conspiracy, the acts of racketeering activity of the enterprise, the overt acts taken in furtherance of that conspiracy as pled herein, each and every Plaintiff has been financially injured in their person, business, and property, including damage to Plaintiff's reputations and

good will; the impairment of Plaintiff's interest in obtaining work [the right to earn wages, like *Diaz*], enormous medical expenses, and other damage to their business, person, and/or property."). Simply put, Plaintiffs do not only allege that because of Defendants' racketeering scheme, they were personally injured because of that scheme. The conspiracy and racketeering activities prevented Plaintiffs from receiving adequate healthcare services.

The federal government awarded three Plaintiffs disability because it recognized the inherent property interest in being able to obtain an income. Am. Compl. at ¶ 86. Furthermore, the federal government recognized that Plaintiffs had a right to healthcare because it automatically enrolled those on disability into Medicare, a federal healthcare program. Due to the Defendants' racketeering activities, which prevented adequate safety warnings on the Levaquin label, the Plaintiffs were unable to obtain adequate medical care through their Medicare healthcare program which was their right to receive adequate care by a physician. For example, one Plaintiff named here saw a physician at the Mayo Clinic and provided her with a long list of new onset medical issues which started after her consumption of Levaquin and which would clearly meet the description announced by the FDA on May 12, 2016: "An FDA safety review has shown that fluoroquinolones . . . are associated with disabling and potentially permanent serious side effects that can occur together. These side effects can involve the tendons, muscles, joints, nerves, and central nervous system."
http://www.fda.gov/Drugs/DrugSafety/ucm500143.htm (Exhibit 10). Because Defendant Hamburg, in concert with each and every other Defendant, suppressed material information about the severe, life-and-death dangers of Levaquin by virtue of her racketeering activity, the Mayo physician wrote in the Plaintiff's medical record that she "appear[s] to have magical

thinking or fixed false beliefs regarding Levaquin" and that she should be referred to a psychiatrist.

Each and every Plaintiff has had similar experiences of inability to obtain adequate healthcare services due to the lack of adequate warnings on the Levaquin because of Defendant Hamburg and each and every Defendant's intentional suppression of information regarding the highly dangerous and deadly effects of Levaquin, which was a direct and proximate result of each and every Defendants' conspiracy, the acts of racketeering activity of the enterprise, the overt acts taken in furtherance of that conspiracy pled in the Amended Complaint.

Importantly, Plaintiff Martin, who is a citizen and resides in Arizona, also alleged a cause of action against each and every Defendant for the Arizona RICO statute, which explicitly gives a right of action for private citizens to sue for "injury to his person, business or property by a pattern of racketeering . . ." A.R.S. § 12-2314.04(A). Therefore, while the federal RICO statute plainly applies to each and every Defendant because of Plaintiffs' injury to business and/or property, so too does the Arizona statute apply to Plaintiff Martin. This is further elaborated in the oppositions for both Johnson & Johnson and Renaissance.

**C.    Defendant Hamburg Is Not Entitled To Qualified Immunity Because When She Violated Plaintiffs' Rights, She Acted Outside Her Discretion as FDA Commissioner.**

A federal officer, like Defendant Hamburg, cannot have discretion to violate criminal or civil statutes or the U.S. Constitution. While citing *Butz v. Economou* in support of her alleged qualified immunity defense, Defendant Hamburg fatally ignores what *Butz* stands for: "in a suit for damages arising from unconstitutional action, federal executive officials *exercising discretion* were entitled only to qualified immunity . . ." *Butz v. Economou*, 438, U.S. 478, 508 (1977) (emphasis added). If a government official, sued in his or her individual capacity, allegedly

commits a tort or a crime outside the discretion of his or her government job function, then that official is not entitled to immunity, qualified or otherwise. Fundamentally, Plaintiffs' Amended Complaint, which must be taken as true, alleges that Defendant Hamburg acted outside the scope of her discretion. Am Compl. at ¶¶ 26, 57, 60, 95, 96(a), (b), 109, 114, 118, 124, 128, 144, and 164.

Indeed, even an allegation of conscious disregard for a plaintiff's safety can be sufficient to overcome claims of qualified immunity. *Willson v. Cagle*, 711 F. Supp. 1521, 1527 (N.D. Cal 1988). In *Willson*, demonstrators were injured when a munitions train collided with the demonstrators outside a naval weapons facility. *Id*. at 1522. The demonstrators commenced a lawsuit against the naval officers and others. The naval officers brought a motion to dismiss and also moved to strike allegations contained in the complaint that they acted recklessly or with gross negligence. The court denied the motion of the naval officers in its entirety, holding that they acted outside the scope of their discretion when they failed to stop the train. Because the officials were aware of the demonstrators on the track, they were therefore not entitled to qualified immunity. *Id*. at 1524-25.

Here, Plaintiffs allege that Defendant Hamburg, in conspiracy with the other Defendants, engaged in a criminal enterprise which resulted in injury to property and business and damaged them, and that not only were her acts and non-acts a "conscious disregard" for their safety, like in *Willson* where the Court ruled that because of the conscious disregard for the plaintiffs, the defendants acted outside the scope of their discretion and therefore were denied immunity, but also that she engaged in the enterprise knowingly and intentionally. Am. Compl. at ¶¶ 60, 80, 95, 101, 158, 169, 235.

Fundamentally, the commission of an intentional tort by a federal official is necessarily

16

outside the scope of his or her employment. *See Arnold v. United States*, 816 F.2d 1306 (9th Cir. 1987) (sexual harassment); *McKinney v. Whitfield*, 736 F.2d 766 (D.C. Cir. 1984) (assault and battery). The commission of an intentional tort that is unrelated to a federal official's duties is beyond even the outer perimeter of the scope of employment. *Willson*, 711 F. Supp. at 1532.

In *McKinney v. Whitfield*, an employee brought an action against a manager for assault and battery. *McKinney*, 736 F.2d at 767-68. Originally, the U.S. District Court for the District of Columbia dismissed the action under Fed. R. Civ. P. 12(b)(6) because the act in question fell within the zone of his discretionary authority because it occurred in the context of a supervisor-employee dispute about a proposed personnel action, the temporary lay-off of the employee. *Id*. at 768. Upon appeal, the U.S. Court of Appeals for the District of Columbia Circuit reversed, ruling that the manager's general engagement in supervision within the scope of his authority did not cloak with immunity the specific conduct at issue; namely, assaulting someone. The court ruled that the manager exceeded the outer perimeters of his responsibilities and acted beyond his line of duty. *Id*. at 771-72. Therefore, immunity was denied. As the nameplate on President Truman's Whitehouse desk read: "The Buck Stops Here."

Here, just as the defendant in *Whitfield*, Defendant Hamburg cannot be cloaked with immunity for damaging and injuring Plaintiffs because of her intentional engagement in a criminal enterprise which reaped her and her husband, Defendant Brown, tens of millions of dollars. This type of engagement is not within Defendant Hamburg's discretion as FDA Commissioner and as such, she is not entitled to qualified immunity.

*Holloman v. Harland* is particularly elucidating and on point. There, a student claimed that his rights were violated when his teacher and principal punished him for silently raising his fist during the daily Pledge of Allegiance. He further claimed that his rights were violated by the

17

teacher's daily ritual of conducting a silent moment of prayer. *Holloman v. Harland*, 370 F.3d 1252, 1259-60 (11th Cir. 2004).

Importantly, in 1995, the Alabama state legislature enacted a statute which *required* the State Board of Education and all local school boards to:

> Develop and implement . . . a comprehensive character education program for all grades to consist of **not less than ten minutes of instruction per day** focusing upon the students' development of the following character traits: courage, **patriotism**, citizenship, honesty, fairness, respect for others, kindness, cooperation, self-respect, self-control, courtesy, **compassion**, **tolerance**, diligence, **generosity**, punctuality, cleanliness, cheerfulness, school pride, respect for the environment, patience, creativity, sportsmanship, loyalty, and perseverance. Each plan of instruction **shall include the Pledge of Allegiance to the American flag**.

Ala. Code § 16-6B-2(h); *Id*. at 1261-62 (emphasis added). This law made daily recitation of the Pledge of Allegiance a part of the character education program the Legislature required local school boards and teachers – government employees – to implement to their students. The Alabama legislature provided one caveat for the students, however, and not the school board or teachers: "The State Board of Education shall afford all students attending public kindergarten, primary and secondary schools the opportunity each school day to voluntarily recite the pledge of allegiance to the United States flag." Ala. Code § 16-43-5; *Id*. at 1263.

At first glance, the U.S. District Court for the Northern District of Alabama mistakenly granted summary judgment (well past the motion to dismiss stage) on both claims as to the teacher and principal on qualified immunity grounds. But the U.S. Court of Appeals for the Eleventh Circuit disagreed and reversed. It analyzed the discretionary function issue, focused on whether the acts or in-acts in question involved exercise of actual discretion, whether the acts or in-acts fell within the employee's job responsibilities, and held that the inquiry regarding whether an official is acting within the scope of his or her discretion is two-fold: the court asks

"whether the government employee was (a) performing a legitimate job-related function (that is, a job-related goal), (b) through means that were within his [or her] power to utilize." *Id*. at 1265. It ruled that:

> Each government employee is given only a certain 'arsenal' of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism. Employment by a local, county, state, or federal government is not a carte blanche invitation to push the envelope and tackle matters far beyond one's job description or achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

*Id*. at 1267. While the U.S. Court of Appeals for the Eleventh Circuit held that the teacher in question "attempt[ed] to pursue the legitimate job-related function of fostering her students' character education by teaching compassion[,]" the teacher the "discretionary function" test because she was not pursuing this job-related goal through legitimate means that fell within her powers. The Court ruled, "[w]hile fostering character development and moral education were undoubtedly part of [the teacher's] official responsibilities, this does not automatically empower her to do anything with in her judgment that furthers those goals." *Id*. at 1283.

In *Holloway*, the U.S. Court of Appeals for the Eleventh Circuit found that the teacher acted outside her legitimate job-related function by silently taking a small amount of time for prayer, *even though* the state legislature required all educators to develop and implement a comprehensive character education program, which instructs students to be courteous, patriotic, honest, fair, kind, compassionate, tolerant, generous, respectful, patient, and loyal. *See* Ala. Code § 16-6B-2(h). Many people in the educator's position may believe that because she was instructed to educate the children on character, and many of the mandatory subjects to be taught are directly related to "The Golden Rule" – that is, do unto others as you would have them do

unto you, a Biblical concept – a moment of silence for personal prayer would be entirely consistent with the state legislature's rule. But, the court still ruled that she was not within her discretion when she tried to follow the Alabama Code.

As for the requirement that the Pledge of Allegiance is recited daily, and because of the character program which is to teach patriotism and respect for others, people may believe that when she punished the student for not reciting the Pledge of Allegiance, she was acting within her job-related functions to teach the student patriotism. But, still, the court ruled that she was not within her discretion when she punished the student for not reciting it.

Where educators and courts can disagree whether the teacher acted within her discretion as a teacher when she held a silent moment of prayer and punished a student for not reciting the Pledge of Allegiance, no educator, court or person can consider Defendant Hamburg's illegal racketeering scheme to be anywhere near part of her discretion as FDA Commissioner.

The U.S. Supreme Court has long held that when a U.S. official acts outside a grant of discretionary authority, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). As the U.S. Court of Appeals for the District of Columbia Circuit explains, "[a] government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers." *Loumiet v. United States*, 968 F. Supp. 2d 142, 158 (D.D.C. 2013). As such, Defendant Hamburg is not entitled to qualified immunity because when she conspired with others and committed acts of racketeering activity, she not only violated the law, but also did so by manipulating and far exceeding the scope of her official powers.

**D.     In the Unlikely Event This Court Concludes That Defendant Hamburg Acted Within Her Discretion as FDA Commissioner When She Violated Plaintiffs' Rights, Defendant Hamburg Is *Still* Not Entitled to Qualified Immunity Because Plaintiffs' Stated Valid Claims That Defendant Hamburg Violated and Those Violated Rights Were Clearly Established.**

Even if the official acted within his or her discretionary functions, qualified immunity does not shield "the plainly incompetent or those who knowingly violate the law."[2] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity protects public officials from personal liability only if the alleged misconduct did not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). It is similar to a good faith defense, but focuses on objective reasonableness, not subjective belief. *Id*. at 818. It balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, the Court looks to (1) whether a plaintiff's allegations, taken as true, show that the official's conduct violated a constitutional or statutory right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). While the *Saucier* Court held that lower courts must decide qualified immunity defenses using that two step analysis in that sequence, contradictory to Defendant Hamburg's Motion to Dismiss, in *Pearson v. Callahan* – a case that Defendant Hamburg mistakenly yet heavily relies on – the U.S. Supreme Court relaxed the analysis, holding that the *Saucier* procedure was not mandatory and that courts should have the flexibility to decide the question in either order. The Court

---

[2]     If a federal employee commits a tort in his or her personal capacity, then he or she is responsible individually and subject to personal liability. Gregory C. Sisk, Litigation With the Federal Government (ALI-ABA, 4th ed. 2006) at § 5.06, at 359.

observed that it is sometimes easier to determine whether a constitutional right was clearly established than whether there is such a right. *Pearson*, 555 U.S. at 235; *see also Thomas v. Shinseki*, 657 F. Supp. 2d 74, 76 (2009) ("Courts have discretion to address either of these questions first.").

> ### 1.   *Plaintiffs' Allegations Are Sufficient to Overcome Any Alleged Qualified Immunity Because Plaintiffs' Have Stated Valid Claims for Defendant Hamburg's Various Violations.*

"Facial plausibility" does *not* equate to facial "probability." *Iqbal*, 556 U.S. at 678. Dismissal is only "proper when, taking the material allegations of the complaint as admitted . . . and construing them in plaintiffs' favor . . . the court finds that the plaintiffs have failed to allege all the material elements of their case of action." *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997).

Plaintiffs have properly pled claims for 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(a), 18 U.S.C. § 1962(b), and 18 U.S.C. § 1962(d). These statutes created a private cause of action for Plaintiffs when they were injured because of Defendant Hamburg's racketeering activity. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ("By including a private right of action in RICO, Congress intended to bring 'the pressure of private attorneys general on a serious national problem for which pubic prosecutorial resources [were] deemed inadequate.'") (citing *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987). Therefore, Defendant Hamburg's futile use of *Thomas v. Shinseki*, 657 F. Supp. 2d 74 (D.D.C. 2009) is wholly inapposite. In *Shinseki*, the plaintiff, an Army veteran, sought benefit payments from the Department of Veterans Affairs. This Court dismissed his case because he "attempt[ed] to characterize defendants' action as a violation of his constitutional 'right to access' the courts[,]" and that he failed to show he suffered a "cognizable legal claim." *Thomas v. Shinseki*, 657 F.

Supp. 2d 74, 76 (D.D.C. 2009). A 'right to access the courts' may not be a cognizable legal claim

for the veteran plaintiff, but RICO's private right of action undoubtedly is. *See H.J. Inc. v.*

*Northwestern Bell Telephone Co.,* 492 U.S. 229, 244 (1989) (declining to read an organized

crime limitation on RICO's private right of action).

The facts alleged, along with the reasonable inferences that must be drawn from those

facts, plausibly demonstrate that Defendant Hamburg suppressed warnings and other material

information from Plaintiffs, physicians, and the public at large because of her racketeering

scheme and conspiracy, acting in concert with each and every other Defendant. Put another way,

Defendant Hamburg has not established that, while accepting as true all factual allegations,

including those in Plaintiffs' exhibits attached hereto, that Plaintiffs' claims are "implausible."

*Moss v. U.S. Secret Serv.*, 711 F.3d 941, 964 (9th Cir. 2013). Indeed, the exhibits Defendant

Hamburg uses to support her argument actually support and confirm the Plaintiffs' allegations.

For example, Defendant Hamburg's Exhibit A supports Plaintiffs' argument that

warnings of devastating mitochondrial toxicity described in the April 17, 2013 FDA report – the

basis for the exhibit – was suppressed by Defendant Hamburg from being placed on the

Levaquin label. The exhibit documents that Defendant Hamburg suppressed warnings of

mitochondrial toxicity and suppressed placement of such warnings on the Levaquin label as

described in the April 17, 2013 FDA report and as requested by Charles Bennett in the June 18,

2014 Citizen Petition sent directly to Defendant Hamburg.

For Exhibit B, although Defendant Hamburg failed to include the FDA Pediatric

Advisory Committee members in this exhibit, it nonetheless supports Plaintiffs' pleaded facts

that Dr. Samuel Maldonado, a paid employee of Defendant Johnson & Johnson, sat on the FDA

Pediatric Advisory Committee at the request of Defendant Hamburg during the time in which

pediatric Levaquin was discussed.  It further documents Plaintiffs' pleaded facts in that there was

no discussion, and was therefore, tacit agreement, that 100% use of pediatric Levaquin for off-

label use was acceptable equating to tacit approval of off-label promotion.

Defendant Hamburg's Exhibit D supports Plaintiffs' argument that Dr. Debra Boxwell, a

"safety evaluator with the Division of Pharmacovigilance" knew about Fluoroquinolone-

Associated Disability (FQAD) since at least 2013.  Specifically, the minutes in this exhibit

include the following statement from Dr. Boxwell: "This review was done to try to characterize

the constellation of symptoms leading to disability that was observed in the previous review

[April 17, 2013] and we will be referring to this constellation as fluoroquinolone-associated

disability, or FQAD."

Defendant Hamburg's Exhibit E supports Plaintiffs' well-pled facts that Defendants,

Hamburg, Brown, Mercer, and Simons clearly knew that Congress wanted to avoid conflicts of

interest.  The exhibit further documents the false and misleading statements Defendant Hamburg

and Defendant Renaissance made to Congress or to the Obama administration indicating that

Defendant Renaissance's Medallion fund is the equivalent of 'a very blind trust' and that "Its

programming does not allow for human tracking or input except in rare instances . . ." This

supports Plaintiffs' argument that, in reality, 100% of the programming at the front end of the

Renaissance computerized trading system is programmed by humans. As Defendant Simons says

in an interview, "The computer is just a tool that we use . . . a good cabinet-maker does not say it

is all because of my wonderful chisel . . . We don't feel like the computer is doing everything.

The computer does what you tell it to do." https://www.youtube.com/watch?v=QNznD9hMEh0

at 38:17-45.

At this stage of the case, Defendant Hamburg cannot claim qualified immunity by simply

rejecting Plaintiffs' factual assertions and inserting her own version of what she believed

occurred. *See Crawford-El*, 523 U.S. at 598 (to "resolve [a] threshold question" of qualified

immunity, the court "assum[es] the truth of the plaintiff's allegations."). If Defendant Hamburg

wishes to contest the strength of Plaintiffs' allegations, those arguments must come after

discovery in a summary judgment motion. Dismissal on a FRCP 12(b)(6) motion at this state is

inappropriate. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) ("[I]f the actions [the

defendant] claims he [or she] took are different from those the [plaintiffs] allege (and are actions

that a reasonable officer [or official] could have believed lawful), then discovery may be

necessary before [defendants] motion for summary judgment on qualified immunity grounds can

be resolved.").

> ### 2. *Plaintiffs' Allegations Are Sufficient to Show that Defendant Hamburg Violated Plaintiffs' Clearly Established Rights.*

The rights that Defendant Hamburg intentionally and recklessly trampled on as a matter

of course were more than clearly established at the time she violated Plaintiffs' rights. Defendant

Hamburg's misconduct violates clearly established law "when, at the time of the challenged

conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would

have understood that what he [or she] is doing violates that right . . .'" *Ashcroft v. al-Kidd*, 563

U.S. 731, 733 (2011) citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In defining what

"clearly established" means, the U.S. Supreme Court ruled that the inquiry "must be undertaken

in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S.

at 201.

> #### a. Plaintiffs' Rights Were Sufficiently Clear When Defendant Hamburg Violated Them.

In *Harlow*, the U.S. Supreme Court ruled that "[w]here an official could be expected to

know that certain conduct would violate statutory or constitutional rights, he [or she] should be made to hesitate." *Harlow v. Fitzgerald*, 457 U.S. 819 (1982). In evaluating this standard, a violation in accordance with pre-existing law or a case directly on point is not necessary; only that the official knew that the rights he or she was violating were clear in that person's mind and experience. Indeed, the law in some circuits *used* to be that a government actor could be denied qualified immunity only for acts that are "so obviously wrong, *in light of pre-existing law*, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter v. Alabama A. & M. Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (emphasis added). But, the U.S. Supreme Court specifically citing *Lassiter* (along with a handful of other cases), held that "this rigid gloss in the qualified immunity standard . . . is not consistent with [the Supreme Court's] cases." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). There need not be a case "on all fours" with identical facts. "Officials can still be notice that their conduct violates established law even in novel factual circumstances. *Id.* at 741. Even "general statements of law are not inherently incapable of giving fair and clear warning [to the official] . . ." *Id.*

In *Hope*, a prisoner was tied to a hitching post and left in the sun. The U.S. Court of Appeals for the Eleventh Circuit found that this was cruel and unusual punishment, but that the officers were protected by qualified immunity because there was no case directly on point holding that such particular behavior violated a statutory or constitutional right. The U.S. Supreme Court reversed, ruling that a case on point is sufficient, but not necessary. *Hope*, 536 U.S. at 755.

In *Guerrero v. Moore*, a police sergeant appealed the district court's denial of his motion for summary judgment on the basis of qualified immunity when the lower court found that he violated plaintiff's Fourth Amendment right even though when he entered the person's home, he

did so to serve a judicially-issued misdemeanor summons. *Guerrero v. Moore*, 442 Fed. Appx. 57, 58 (4th Cir. Va. 2011). The U.S. Court of Appeals for the Fourth Circuit affirmed, ruling "[w]e find that the right at issue [entering a home without a warrant but with a summons] was clearly established at the time of the incident." *Id*. at 59; *see also Espinosa v. City & County of San Francisco*, 598 F.3d 528 (9th Cir. 2010) (Officers entered an apartment where the decedent was staying and searched it. They found a bloody shirt and detained one person. They found the decedent in the attic and when he did not follow orders to put his hands up, the officers fatally shot him. The U.S. Court of Appeals for the Ninth Circuit affirmed the lower court's decision in denying summary judgment in favor of defendant officers, because "fact issues remained concerning whether the officers violated the Fourth Amendment.").

Congress enacted the RICO statute to combat organized and white-collar crime and in so doing, created civil as well as criminal remedies to compensate victims. These remedies are the flipside of the same coin. RICO makes it unlawful to acquire, operate, or receive income from an enterprise through a pattern of racketeering activity. RICO lists numerous federal offenses that the statute defines as racketeering: bribery, mail and wire fraud, embezzlement, obstruction of justice and other violations. When Defendant Hamburg used the U.S. mail and wires to further her racketeering scheme, she violated RICO.  The law does not get more clearly established than that.

        b.      A Reasonable Official In Defendant Hamburg's Position Would Have Understood That His or Her Misconduct Violated That Right.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his [or her] conduct was unlawful in the situation he [or she] confronted." *Saucier*, 533 U.S. at 195 citing (*Wilson v. Layne*, 526 U.S. 603,

615 (1999). The principles of qualified immunity shield an officer when that person *reasonably believes* that her conduct complies with the law. *Pearson*, 555 U.S. at 244 (emphasis added). The essential inquiry is: would an objectively reasonable official have known that his conduct was unlawful? *See Anderson*, 483 U.S. at 640.

As discussed, in *Hope*, with regard to whether there needs to be a case factually on point in order for qualified immunity to be pierced, the U.S. Supreme Court reversed the lower court's decision, stating that a case on point is not necessary. *Hope*, 536 U.S. at 755. With regard to reasonableness, the U.S. Supreme Court ruled that a reasonable person would have known that handcuffing a prisoner to a hitching post is a violation of a clearly established right and in violation of the Eighth Amendment. *Id*. at 742.

Just as a reasonable person would have known that it is a violation of a prisoner's rights to handcuff him to a hitching post, so to is it unreasonable to intentionally participate in a racketeering scheme to suppress material information about the severe, life-and-death dangers of Levaquin, in order to reap huge financial benefits at the expense of Plaintiffs and the American citizenry.

### 3.    *Plaintiffs' Sufficient Failure to Warn Allegations*

Defendant Hamburg's recitation of Plaintiffs' allegations regarding her failure to warn is patently false. Defendant Hamburg's involvement is not question of whether she failed to warn Plaintiffs and the American citizenry of the devastating and deadly effect of Levaquin. Rather, Defendant Hamburg, acting in concert with each and every other Defendant, illegally suppressed the deadly effects of Levaquin in an attempt to cover-up the truth and enrich herself and her husband. First, Defendant Hamburg misleads this Court by improperly recasting and ignoring the facts she does not like. "Plaintiffs do not identify a single instance in which Dr. Hamburg took

any action or gave any instruction to conceal anything." Motion to Dismiss at pg. 18. This is false. Second, she mischaracterizes the presentation given by Dr. Debra Boxwell in an apparent attempt to mask the actual proceedings, which made clear that Defendant Hamburg was aware of the devastating effects of Levaquin since 2013 and intentionally suppressed this material information. Third, Defendant Hamburg seeks to put the blame on someone else; stating that "actions taken, or not taken, by the FDA as an agency provide no grounds for invading Dr. Hamburg's immunity." Motion to Dismiss at pg. 19 n. 7. This, too, is false. Between Defendant Hamburg, her husband Defendant Brown, Defendant Renaissance, and Defendant Johnson & Johnson, "hear no evil, see no evil, do no evil" is a nonsensical defense. In any event, and most importantly, these protestations are not relevant to her 12(b)(6) motion to dismiss, and can be taken up during discovery.

Plaintiffs plead specific instances of Defendant Hamburg's actions and inactions in an attempt to conceal the deadly effects of Levaquin. For example, Plaintiffs allege specific instances where U.S. Senators and U.S. Representatives contacted Defendant Hamburg and the FDA requesting hearings about the deadly effects of Levaquin and requesting additional safety warnings. Am. Compl. at ¶¶ 64-71. More specifically, on June 18, 2014, Dr. Charles Bennett, from the Center for Medication Safety and Efficacy Southern Network on Adverse Reactions sent a Citizen's Petition directly to Defendant Hamburg requesting her to order adequate information on the Levaquin label regarding mitochondrial toxicity and implicated neurodegenerative diseases. *Id*. at ¶ 74; Exhibit 8. Then again, in August of 2014, Defendant Hamburg received hundreds of emails from individuals who had severe Levaquin adverse effects. Exhibit 7. In September of 2014, Dr. Charles Bennett sent an additional Citizen's Petition directly to Defendant Hamburg requesting her to stop suppressing information and to

order adequate information on the Levaquin label regarding additional adverse events. Exhibit 9.

"[B]ut Defendant did not order that adequate information be included on the Levaquin label

because of her personal, financial interest in maintaining Levaquin's branding as 'status quo'

because of her husband's stock interests in Defendant Renaissance Technologies, specifically

Johnson & Johnson." *Id*. at 75.

 As for Defendant Hamburg's mischaracterization of Dr. Debra Boxwell's testimony, the

record, and ironically Defendant Hamburg's own Exhibit D, speaks for itself.

> **Dr. Boxwell**: Good morning. My name is Debbie Boxwell, and I'm a safety
> evaluator with the Division of Pharmacovigilance. Today, I will be describing a
> case series from the FDA's Adverse Event Reporting System, also known as
> FAERS, titled, Fluoroquinolone-Associated Disability Cases in Patients being
> Treated for Uncomplicated Sinusitis, Bronchitis, and/or Urinary Tract Infection.
> As Dr. Nambiar mentioned, **in 2013** the FDA did a review describing disabling
> peripheral neuropathy associated with fluoroquinolone use. This resulted in a
> labeling change in the warnings and precautions section, describing the potential
> for irreversible peripheral neuropathy. **In addition, while reviewing these
> FAERS cases, it was noted that 76 percent of patients with peripheral
> neuropathy also reported adverse events, or AEs, involving other body
> systems, including neuropsychiatric, vision, cardiac, and musculoskeletal
> events such as tendinitis, tendon rupture, myalgia, and arthralgia. The
> duration of many of these other adverse events also appeared to be prolonged
> and disabling.** This review was done to try to characterize the constellation of
> symptoms leading to disability that was observed in the previous review, and we
> will be referring to this constellation as fluoroquinolone-associated disability, or
> FQAD.

Defendant Hamburg's Exhibit D (emphasis added). As documented by Dr. Boxwell and ignored

by Defendant Hamburg, Dr. Boxwell admitted at the November 5, 2015 FDA Advisory

Committee meeting that 76% of individuals diagnosed for Fluoroquinolone-Associated

Disability Cases in Patients being Treated for Uncomplicated Sinusitis, Bronchitis, and/or

Urinary Tract Infection reported "multi-system disability." Defendant Hamburg knew of the

"multi-system disabilities" since 2013, as directly referenced by Dr. Boxwell. Am. Compl. at ¶¶

61, 95.

Defendant Hamburg's argument that she is immune in any event because she can only be responsible for her own misconduct is equally disingenuous. Defendant Hamburg cites to an ancient 204-year-old case which she believes stands for the proposition that her liability can result only from her own alleged misconduct, not for failing to "properly superintend[]" the discharge of his subordinates' duties. Motion to Dismiss at pg. 19, n. 7; *Dunlop v. Munroe*, 7 Cranch 242, 269 (1812). But this starkly general proposition is debunked in hundreds of later cases, some decided just a few years ago.

It is well established that a supervisor may be held liable for statutory or constitutional rights violations based on his or her own neglect in failing to properly superintend his or her subordinate's duties. *See e.g., Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In *Kenley v. District of Columbia*, plaintiff videotaped an "unpleasant experience" during the arrest of his friend. The plaintiff videotaped the interaction on his cellphone. Allegedly, an officer charged at plaintiff, knocked his phone out of his hands, and pushed him to the ground. Plaintiff sued. *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 27 (D.D.C. 2015). In evaluating supervisory liability, the court analyzed a "deliberate indifference" theory, ruling:

> when city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional [or statutory] rights, the city may be deemed deliberately indifferent if the policy makers choose to retain that program. A municipality can likewise be liable for inadequately supervising its employees if it was deliberately indifferent to an obvious need for greater supervision.

*Id*. at 34 (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011); *see also Singh v. District of Columbia*, 55 F. Supp. 3d 55 (D.D.C. 2014) (holding a claim that the District of Columbia was liable for abuse of process survived summary judgment, as a jury could reasonably find that officer acted with ulterior motive when issuing tickets to plaintiff based on a "deliberate indifference theory").

In *Barnhardt v. District of Columbia*, a plaintiff arrestee sued defendants, including the District of Columbia, because of, *inter alia*, a partial strip search in front of his home. *Barnhardt v. District of Columbia*, 560 F. Supp. 2d 15, 16-17 (D.D.C. 2008). The motion to dismiss the complaint for the District of Columbia was denied because the arrestee's allegation that the District knowingly or negligently failed to instruct, supervise, control and discipline two officers was adequate to survive the motion to dismiss. *Id*. at 21; *see also Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) ("Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation [direct liability] or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation [supervisorial liability].").

The ruling in *Ammons v. State Dep't of Soc. & Health Servs*. is also on point. There, a patient was involuntarily committed to a residential psychiatric hospital and, at the age of 14, was involved in a sexual relationship with a male staff member who previously had been accused of sexual molestation by another minor patient. The plaintiff sued the former Chief Executive Officer ("CEO") of the psychiatric hospital for failing to supervise her employees. *Ammons v. State Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1024-25 (9th Cir. 2011). The court ruled that the CEO was not entitled to qualified immunity because, supposing the plaintiff's allegations were true, a reasonable jury could conclude that the CEO demonstrated a substantial departure from accepted professional judgment that amounted to a violation of the patient's clearly established rights. *Id*. at 1032.

Defendant Hamburg also fatally cites to a 128-year-old case with a holding that is entirely inapposite by Defendant's *own* interpretation of it. "A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances or negligences or

32

omissions of duty, of the subagents or servants or other persons properly employed by or under

him [or her], in the discharge of his [or her] official duties." *Robertson v. Sichel*, 127 U.S. 515-

516 (1888). But, this old, U.S. Supreme Court case only applies if Plaintiffs alleged that

Defendant Hamburg acted negligently. But, intentionally and knowingly participating in a

grandiose racketeering scheme that involves bribery, fraud, hundreds of millions of dollars, and

the death of innocent victims can hardly be considered negligent! Indeed, Plaintiffs' allege a

much higher level of participation from Defendant Hamburg than negligence. Am. Compl. at ¶¶

60, 80, 95, 101, 158, 169, 204, 235 (". . . willfully and intentionally and illegally prevent[ed] the

FDA from issuing warnings about the devastating and life-threatening effects of Levaquin" . . . "

. . . intentionally and/or negligently interfered with, without  limitation, Plaintiffs' contractual

expectations, business expectations, and prospective economic advantage" . . . ". . . willfully and

intentionally suppressing material information . . ."). These hard, inescapable facts that Plaintiff

allege in their Amended Complaint make the point that it is the height of hypocrisy and a sad

commentary on Defendant Hamburg and her legal counsel that rather than deal with these facts

as they are alleged, the motion to dismiss improperly asserts and injects both false facts and

misstates law and further accuses Plaintiff of inserting offensive material into the Amended

Complaint.

### 4.    *Plaintiffs' Sufficient Conflict of Interest Allegations*

Under federal law, it is illegal for Defendant Hamburg, having been an employee of the

U.S. government, to participate personally and substantially through decision, approval,

disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial

or other proceeding, application, request for a ruling or other determination, contract, claim,

controversy, charge, accusation, arrest or other particular matter in which, to her knowledge, she,

her spouse, minor child, general partner, organization in which she is serving as officer, director, trustee, general partner or employee, or any person or organization with whom she is negotiating or has any arrangement concerning prospective employment, or has a financial interest. 18 U.S.C. § 208. It completely bars a "[f]ederal employee from participating personally and substantially as a [g]overnment employee in any particular matter in which the employee has a financial interest. These restrictions also apply regarding the interests of an employee's spouse . . ." http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm197511.htm (Exhibit 11). This conflict of interest statue strictly prohibits Defendant Hamburg and her husband, Defendant Peter Brown, from having a "financial interest" in any company regulated by the FDA.

Instead of taking Plaintiffs' allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, Defendant Hamburg improperly goes outside the Amended Complaint and prefers to recast and ignore inconvenient, factually-based allegations that specifically allege she violated 18 U.S.C. § 208 by having a "personal" and "substantial" involvement in ignoring repeated requests for safety warnings that should have been included on the Levaquin label. For example, first, Plaintiffs allege that during and throughout her tenure with the FDA, Defendant Hamburg was at all material times married to Peter Brown, the co-CEO of Renaissance Technologies. Am. Compl. at ¶ 42 ("From May of 2009 to March of 2015, Defendant Hamburg was employed as the FDA Commissioner. During the time Defendant Hamburg was FDA Commissioner, she was married to Defendant Brown, who at all material times was an executive or co-CEO of the hedge fund, Renaissance Technologies, during and throughout Defendant Hamburg's tenure as FDA Commissioner."). Second, Plaintiffs allege that Defendant Brown "is an individual, natural person who was an executive or co-CEO of Renaissance Technologies during May 2009 to March 2015. Am. Compl. at ¶ 25. Third, Plaintiffs allege, "Defendant

Hamburg and the other Defendants, each and every one of them, jointly and severally, participated and profited personally and substantially in and from many matters in which she and her spouse, Defendant Renaissance Technologies' co-CEO, Defendant Brown, had a financial interest." Am. Compl. at ¶ 59. Then, Plaintiffs allege that Defendant Brown shared in Renaissance Technologies' profits, made in part from stocks held in pharmaceutical companies and companies considered significantly regulated by the FDA. *Id*; *see* Exhibits 12, 13 ("From managing directors to cleaning staff, everyone receives a percentage of the profits . . . " "[p]eople get paid based on the profits of the entire firm. You don't get paid just on your work. You get paid on the profits of the firm. So everyone gets paid based on the firm's success."). Defendant Hamburg's attempt to misrepresent Plaintiffs' factually-based allegations is transparent.

More to the point, and to assuage Defendant Hamburg's fears that Plaintiffs "do[] not, because [they] cannot," plead facts that show Defendant Hamburg's personal and substantial involvement, Plaintiffs allege that Johnson & Johnson manufactures Levaquin and that Renaissance Technologies held as much as half a billion dollars of Johnson & Johnson stock during the time of Defendant Hamburg's FDA employment. *See* Am. Compl. at ¶¶ 12, 17, 22, 25, 26, 30, 52, 53, 55. Indeed, the Amended Complaint in its entirety is wrought with Defendant Hamburg's "personal" and "substantial" involvement in her racketeering scheme, replete with charts outlining not only her suppression of pertinent information regarding Levaquin, but also of Alkermes, the manufacturer of Zohydro, another company regulated by the FDA in which Renaissance Technologies, run by Defendant Brown, held millions of dollars of stock in. Defendant Hamburg, acting illegally and outside the scope of her discretion in furtherance of the racketeering enterprise and conspiracy, counseled the FDA to approve Zohydro, despite the fact that on December 7, 2012, an FDA Advisory Committee voted 11 to 2 against its approval. Am.

Compl. at ¶ 57; In or around March 2013, Defendant Hamburg personally testified to members of Congress that she supported Zohydro's approval. *Id*; http://news.yahoo.com/fda-chief-defends-zohydro-criticism-intensifies-220949363.html (Exhibit 14). At the end of 2012, Renaissance Technologies held $829,000 of stock in Alkermes, the manufacturer of Zohydro. After Defendant Hamburg's testimony to Congress in March of 2013, however, the value jumped from $829,000 to $2,792,000, to an astonishing $22,792,000 within a six-month period. *Id*. at ¶ 58.

Another flagrant example of Defendant Hamburg and Defendant Brown's violations of 18 U.S.C. § 208 pertains to the drug company, OraSure. As was not coincidentally true for Levaquin and Zohydro, from May 2009 to March 2015 during Defendant Hamburg's tenure at the FDA, including in October 2014, Defendant Renaissance also held millions of dollars of stock in OraSure. October 14, 2014, Defendant Hamburg personally visited OraSure in Bethlehem, Pennsylvania to encourage the company to develop an Ebola test. http://www.mcall.com/business/mc-orasure-fda-visit-20141014-story.html. Two days later, on October 16, 2014, it was reported that OraSure stock "is up 13% premarket on average volume in response to a report that FDA Commissioner Dr. Margaret Hamburg visited the company to discuss developing an Ebola screening produced based on its home HIV test." http://seekingalpha.com/news/2035085-orasure-up-premarket-on-yet-another-ebola-play.

Moreover, Defendant Johnson & Johnson, Alkermes, and OraSure are far from the only examples of Defendant Hamburg's and Defendant Brown's clear criminal violations of 18 U.S.C. § 208, the federal conflict of interest statute. Defendant Renaissance held a long list of other drug company stocks, totaling more than a billion dollars, during Defendant Hamburg's

tenure as FDA Commissioner.[3]

When Defendants Hamburg, Brown, and Renaissance indicated that Defendant Renaissance's Medallion fund is the equivalent of 'a very blind trust', (Exhibit 15), Defendant Hamburg further violated 18 U.S.C. § 208 which prohibited her from "participating personally and substantially . . . in any particular matter in which the employee has a financial interest" because she did not take into account the "financial interest" reporting required of those who hold a "blind trust" as described in the "Financial Disclosure by Federal Officials and Publication of Disclosure Reports."

> The conflict of interest theory under which the 'blind trust' provisions operate is that since the government officer will eventually not know the identity of the specific assets in the trust . . . those financial interests could not act as influences on the officer or employee's official decisions, thus avoiding real or apparent conflicts of interests.

> Assets originally placed into the trust will, of course, be known to the official, and therefore will generally continue to be 'financial interests' of the public official for conflict of interest purposes, when applicable, until the trustee notifies the official 'that such asset has been disposed of, or has a value of less than $1,000.

https://fas.org/sgp/crs/misc/R43186.pdf (Exhibit 16); Am. Compl. at ¶¶ 53, 54, 59, 116, 119, 126. By definition, the "assets originally placed" into the Medallion Fund at the time Defendant Hamburg became FDA Commissioner in May of 2009 are considered to be "known" and considered to be "financial interest" until these assets are disposed of. Therefore, Defendant Hamburg and her husband, Defendant Peter Brown, had a "financial interest" in all the drug stocks and stocks in companies considered regulated by the FDA in the Medallion Fund as of May of 2009 until they were disposed of or had a value of less than $1,000.

Only a few examples of drug companies in which Defendant Hamburg and Defendant

---

[3]     Defendant Margaret Hamburg is currently under criminal investigation by the Federal Bureau of Investigation and Plaintiffs have been in contact with Special Agent William Novak in this regard.

Brown had "financial interest" as determined in May 2009, and thus Defendant Hamburg was prohibited from participating in matters related to are attached as Exhibit 17, and include Bristol-Myers Squibb, Merck, Astrazeneca, Amgen, Gilead Sciences, Biogen, Spectrum Pharmaceuticals, Valeant Pharmaceuticals, Novartis, *and Johnson & Johnson*. These examples highlight Defendant Hamburg's personal participation when on December 11, 2014, she wrote about "getting novel drugs to market":

> To ensure that 2014's novel drugs get to patients as quickly as possible, CDER effectively employed a variety of regulatory tools including FDA's expedited development and review programs – fast track priority review, accelerated approval and our new breakthrough therapy designation. Early and repeated communications with sponsors have also been helpful in speeding these products to market.

http://blogs.fda.gov/fdavoice/index.php/2014/12/2014-drug-approvals-speeding-novel-drugs-to-the-patients-who-need-them/. These "novel" drugs that Defendant Hamburg boasted about "speeding . . . to market" were manufactured by companies in which she was prohibited from participating. Not coincidentally, her husband, Defendant Brown, and Defendant Renaissance, held stock in all these companies.

http://www.sec.gov/Archives/edgar/data/1037389/000103738909000398/0001037389-09-000398.txt.

| Drug Manufacturer | Amount of Stock held by Renaissance as of 6/30/2009 When Dr. Hamburg Became FDA Commissioner (SEC website) |
|---|---|
| Amgen | $68,005,000 |
| Astrazeneca | $10,691,000 |
| Biogen | $9,179,000 |
| Bristol Myers Squibb | $14,808,000 |
| Gilead Sciences | $136,174,00 |
| Johnson & Johnso/Janssen | $25,134,000 |
| Merck | $12,962,000 |
| Novartis | $19,330,000 |
| Spectrum Pharmaceuticals | $5,572,000 |
| Valeant Pharmaceuticals | $3,558,000 |
| Total | $305,413,000 |

Furthermore, Defendant Hamburg's Quarterly Ethics Statements do not list the stocks held in Renaissance's Medallion Fund at the time Defendant Hamburg became FDA Commissioner as a "financial interest." *See* Exhibit 17.

Unfortunately for everyone, Defendant Hamburg's personal participation in this scheme was substantial and therefore she is not entitled to qualified immunity because she unequivocally violated the conflict of interest statute, 18 U.S.C. § 208.

### 5.    *Plaintiffs' Sufficient Campaign Contributions Allegations*

Yet again, Defendant Hamburg misstates and intentionally ignores the allegations of Plaintiffs' Amended Complaint. Defendant Hamburg's argument that Plaintiffs' case hinges on her's, her husband's, and Renaissance's contributions to Mrs. Clinton's political campaigns and Defendant Johnson & Johnson's contributions to The Clinton Foundation which are easily

39

verifiable on the Internet (*see* Sarah Westwood, "State Department spending followed foreign

Clinton Foundation donors," <u>Washington Examiner</u> (May 29, 2015 and Kimberly Leonard,

"Hillary Takes Millions in Campaign Cash From Enemies," <u>U.S. News and World Report</u>

(October 14, 2015), is an intentional red herring, intended to divert the Court's attention to all of

the other serious underlying RICO predicate acts as pled in the Amended Complaint. These so-

called contributions, which are alleged to constitute bribes by fraudulently using the U.S. wires

and mails to effect, are only one of many RICO predicate acts, and thus they form only one

aspect of Defendants' racketeering activity.

Indeed, that Mrs. Clinton would somehow be involved in the alleged RICO conspiracy

does not defy logic; she, her husband and The Clinton Foundation are now also under FBI

criminal investigation over the alleged illegal misuse of a private email server and related

criminal acts related to their use of this private email servicer to peddle influence for favorable

acts, policies, and rulings by the former Secretary of State.

This conduct is not new. In the 1990s, the undersigned counsel, while the head of Judicial

Watch, which he founded, uncovered a scandal known as China-gate, where Hillary and Bill

Clinton and the Democratic National Committee received illegal campaign contributions from

the Chinese government and others in exchange for government "favors" during the Clinton

administration.

It is thus likely and not just coincidental, that Defendant Hamburg is being represented by

the same lawyer, Beth Wilkinson, who while Ms. Wilkinson's integrity is not being put at issue,

represents a myriad of Hillary Clinton aides, such as Cheryl Mills and Bryan Pagliano to name

just a few, who are enmeshed along with Mrs. Clinton, in this latest Clinton scandal, which has

triggered an on-going FBI criminal investigation and collateral civil Freedom of Information Act

lawsuits of Judicial Watch and Freedom Watch. Many of Ms. Wilkinson's clients either have

obtained immunity agreements and/or are taking the Fifth to try to avoid incriminating

themselves, the Clintons and their Foundation.

In short, the allegation concerning one predicate act involving bribes to Hillary Clinton,

her husband and her Foundation is more than believable, and is only one of the numerous well

pled predicate acts set forth with particularity in the Amended Complaint. Discovery will provide

additional proof of these allegations in furtherance of trial.

     **E.**     **The Issue of Defendant Hamburg's Alleged Qualified Immunity Must Ultimately Be Determined After Discovery**

Trial courts are afforded broad discretion to regulate the progression of their cases,

including discovery. In the event factual questions must be settled in order to resolve a claim of

qualified immunity, the plaintiff is entitled to discovery. *Kartesva v. Dep't of State*, 37 F.3d

1524, 1530 (D.C. Cir. 1995). In *Kartesva*, the plaintiff employee claimed that, as a result of a

background security check and her disqualification, she was discharged from a government

contract job and unable to find subsequent work. *Kartesva v. Dep't of State*, 37 F.3d 1524, 1525

(D.C. Cir. 1995). Because a factual dispute existed between the parties as to whether the

defendant violated a right, the U.S. Court of Appeals for the District of Columbia Circuit held

that limited discovery is appropriate in order to determine threshold issues, such as whether a

right was violated and whether it was clearly established. *Id*. at 1530.

In *Mitchell v. Forsyth*, the U.S. Supreme Court outlined the contours of permissible

discovery in the context of a defendant raising an alleged qualified immunity defense. There, a

plaintiff filed a claim for damages against the U.S. Attorney General, John Mitchell, after he

learned Mitchel had allegedly authorized a wiretap on his home. *Mitchell v. Forsyth*, 472 U.S.

511, 513-15, (1985). The Court held that discovery may be permitted to enable the Court to

assess the facts pertinent to the qualified immunity defense. *Id*. at 526.

The U.S. Supreme Court re-affirmed this approach in *Anderson v. Creighton*. In *Anderson*, the Creighton family sued Federal Bureau of Investigation ("FBI") agents after a warrantless search of their home. *Anderson v. Creighton*, 483 U.S. 635, 637 (1987). The Court held that:

> . . . if the actions Anderson claims he took are different from those the Creighton's' allege (and are actions that a reasonable officer could have believed lawful), then discovery may be necessary before Anderson's motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of Anderson's qualified immunity.

*Id*. at 647.

Similarly, in *Crawford v. Britton*, a "litigious and outspoken" prisoner claimed that he was retaliated against due to lawsuits he had filed, and he brought new claims under the First Amendment. *Crawford v. Britton*, 523, U.S. 574 (1998). In addressing qualified immunity within Courts of Appeals, the U.S. Supreme Court emphasized that while "[d]iscovery involving public officials is indeed one of the evils that *Harlow* aimed to address, [] neither that opinion nor subsequent decisions create an immunity from *all discovery*." *Id*. at 593 (emphasis added). Indeed, "the Court of Appeals' indirect effort to regulate discovery employs a blunt instrument that carries a high cost, for its rule also imposes a heightened standard of proof at trial upon plaintiffs with bona fide constitutional [or statutory] claims." *Id*. at 595-96.

These binding, U.S. Supreme Court rulings are glaringly in favor for allowing for discovery in this case for two reasons: First, the *Anderson* Court ruled that even *if a reasonable official could have believed his actions were lawful*, plaintiffs were *still* entitled to discovery. As discussed above, no reasonable official in this history of U.S. government could believe that the actions and inactions of Defendant Hamburg were lawful. People have died because of her

racketeering scheme and hundreds of thousands are irreparably wounded and/or nearing death. Second, and as important, not only should a motion to dismiss be denied, such as here, but also the *Anderson* Court even denied a motion for summary judgment on the grounds that discovery was needed to ascertain factual disputes. In *Anderson*, only if the defendant could establish after discovery that a reasonable official could have believed his or her behavior was lawful was defendant entitled to summary judgment.[4]

## II.   CONCLUSION

For all the compelling reasons, Defendant Margaret Hamburg's FRCP 12 (b)(6) motion to dismiss must be denied. Plaintiffs have properly pled colorable claims against her and she is not entitled to qualified immunity. Instead of addressing these claims, counsel for Defendant Hamburg seeks to confuse the Court by injecting extraneous and irrelevant facts into the Court's analysis, which is not appropriate at this stage of the pleading process.

Nor do Defendant Hamburg's legal arguments have merit. Having allegedly conspired with the other Defendants to suppress information about the highly dangerous nature of Levaquin, a drug which has literally killed over 5,000 persons and left tens of thousands in life-threatening or damaged conditions and critically debilitated – as shown by the FDA's own statistics as pled in the Amended Complaint – Defendant Hamburg cannot escape liability by virtue of her false contention that she is immune from the RICO crimes, pled in this civil action, that she is alleged to have committed.

The so-called story of Defendant Hamburg has regrettably become the modern day version of literary icon Norman Mailer's "Washington, D.C." The callous and deadly corruption

---

[4]     Federal circuit courts even allow the question of qualified immunity to go to the jury. *See Curley v. Klem*, 499 F.3d 199, 208 (10th Cir. 2007) ("The Fifth, Sixth, Ninth, and Tenth Circuits have permitted the question [of qualified immunity] to go to juries.").

alleged in the Amended Complaint is not unique, particularly in the world of BigPharma, the most powerful lobby in the nation's capital by far. Couple that with the greed of dubious hedge funds like Defendant Renaissance, and not coincidentally its co-CEO Defendant Peter Brown, who just happens to be the husband of Defendant Hamburg, and you have the making of the racketeering enterprise and other counts sufficiently pled in the Amended Complaint.

In short, Defendant Hamburg's FRCP 12 (b)(6) motion must be summarily denied and this case must now enter the discovery phase. Defendant Hamburg and the other Defendants will have an opportunity, if they should so decide, to move for summary judgment after discovery closes, however futile that move will prove to be.

Dated: June 13, 2016

Respectfully submitted,

/s/ Larry Klayman_____
**Larry Klayman, Esq**.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Attorney for all Plaintiffs*

44

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of June, 2016, a true and correct copy of the foregoing Opposition to Defendant Hamburg's Motion to Dismiss the Amended Complaint was filed and served via CM/ECF and served upon the following:


**Michael M. Maya**
COVINGTON & BURLING LLP
850 Tenth Street, NW
One City Center
Washington, DC 20001
(202) 662-5547
Email: mmaya@cov.com

*Counsel for Johnson & Johnson, Johnson & Johnson Pharmaceutical Research and Development, LLC, Ortho-McNeil-Janssen Pharmaceuticals, Inc.*

**Anthony Joseph Jay, III**
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, NW
Washington, DC 20001
(202) 862-2248
Email: joseph.jay@cwt.com

*Counsel for Renaissance Technologies, LLC, Peter F. Brown, Robert L. Mercer, James H. Simons*

**Kenneth Leonard Wainstein**
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, NW
Washington, DC 20001
(202) 862-2474
Fax: (202) 862-2400
Email: ken.wainstein@cwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*Counsel for Renaissance Technologies, LLC, Peter F. Brown, Robert L. Mercer, James H. Simons*

**Lauren A. Moskowitz**
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

(212) 474-1648
Fax: (212) 474-3700
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Counsel for Renaissance Technologies, LLC, Peter F. Brown, Robert L. Mercer, James H. Simons*

**Roger G. Brooks**
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1072
Fax: (212) 474-3700
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

*Counsel for Renaissance Technologies, LLC, Peter F. Brown, Robert L. Mercer, James H. Simons*

**Alexandra M. Walsh**
WILKINSON WALSH + ESKOVITZ, PLLC
1900 M Street, NW
Washington, DC 20036
(202) 847-4000
Email: awalsh@wilkinsonwalsh.com

*Counsel for Dr. Margaret Hamburg*

**Beth A. Wilkinson**
WILKINSON WALSH + ESKOVITZ, PLLC
1900 M Street, NW
Washington, DC 20036
(202) 847-4000
Email: bwilkinson@wilkinsonwalsh.com

*Counsel for Dr. Margaret Hamburg*